1  Jack Silver, Esq. SBN #160575
   Law Office of Jack Silver
2  Post Office Box 5469
   Santa Rosa, CA 95402-5469
3  Tel.(707) 528-8175
   Fax.(707) 528-8675
4  lhm28843@sbcglobal.net

5  Attorneys for Plaintiff
   NORTHERN CALIFORNIA RIVER WATCH
6

7  ROGERS JOSEPH O'DONNELL
   ROBERT C. GOODMAN, SBN 111554
8  ANN M. BLESSING, SBN 172573
   D. KEVIN SHIPP, SBN 245947
9  311 California Street
   San Francisco, CA 94104
10 Tel. (415) 956-2828
   Fax. (415) 956-6427
11 rgoodman@rjo.com

12 Attorneys for Defendants
   CHEVRON U.S.A. INC. and
13 CHEVRON CORPORATION

14            UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16

17 NORTHERN CALIFORNIA RIVER          CASE NO.:  4:09-cv-00669 CW
   WATCH, a non-profit corporation,
18                                    **STIPULATION RE FILING FIRST**
                Plaintiff,            **AMENDED COMPLAINT;**
19      v.                            **[PROPOSED] ORDER**

20 CHEVRON U.S.A. INC., CHEVRON
   CORPORATION, and DOES 1 - 10,
21  Inclusive

22            Defendants.
                                 /
23

24      IT IS HEREBY STIPULATED and agreed to by and between the parties to this action,

25 that Plaintiff NORTHERN CALIFORNIA RIVER WATCH shall be allowed to file the First

26 Amended Complaint for Injunctive Relief, Civil Penalties, Restitution and Remediation, a copy

27 of which is attached hereto as Exhibit "A".  By stipulating to the filing of the First Amended

28                                  1

1   Complaint, Defendants CHEVRON U.S.A. INC. and CHEVRON CORPORATION are not

2   approving or admitting the allegations or contents of the First Amended Complaint, or waiving

3   their defenses thereto.

4           IT IS FURTHER STIPULATED and agreed to by and between the parties to this action,

5   that Defendants  CHEVRON U.S.A. INC. and CHEVRON CORPORATION will have twenty

6   (20) days (plus three days for mail service) from the date of service of the First Amended

7   Complaint within which to plead in response to the First Amended Complaint.

8

9   Dated: July 14 , 2010

10                                          ROBERT C. GOODMAN
                                            Attorney for Defendants
11                                          CHEVRON U.S.A. INC. and
                                            CHEVRON CORPORATION

12

13          In addition to stipulating to the above, I, Jack Silver, attest that concurrence in the filing

14   of this Stipulation has been obtained from the other signatory to this document.

15   Dated: July 15 , 2010

16                                          JACK SILVER
                                            Attorney for Plaintiff
17                                          NORTHERN CALIFORNIA RIVER WATCH

18

19                              [PROPOSED] ORDER

20          PURSUANT TO STIPULATION, IT IS SO ORDERED.

21

22   Dated: ___ July 19, 2010 _____

23                                          CLAUDIA WILKIN
                                            UNITED STATES DISTRICT JUDGE

24

25

26

27

28                                          2

# EXHIBIT   A

1   Jack Silver, Esq. SBN #160575
    Law Office of Jack Silver
2   Post Office Box 5469
    Santa Rosa, CA 95402-5469
3   Tel.(707) 528-8175
    Fax.(707) 528-8675
4   lhm28843@sbcglobal.net

5   Attorneys for Plaintiff
    NORTHERN CALIFORNIA RIVER WATCH
6

7                  UNITED STATES DISTRICT COURT

8                 NORTHERN DISTRICT OF CALIFORNIA

9

10  NORTHERN CALIFORNIA RIVER          CASE NO.:   4:09-cv-00669 CW
    WATCH, a non-profit corporation,
11                                     **FIRST AMENDED COMPLAINT FOR
                    Plaintiff,         INJUNCTIVE RELIEF, CIVIL PENALTIES,
12        v.                           RESTITUTION AND REMEDIATION
                                       [Clean Water Act 33 U.S.C. § 1251 et seq.;
13  CHEVRON U.S.A. INC., CHEVRON       Resource Conservation & Recovery Act
    CORPORATION, and DOES 1 - 10,      42 U.S.C. § 6901 et seq.]**
14  Inclusive,

15                  Defendants.
    _____/
16

17        Plaintiff NORTHERN CALIFORNIA RIVER WATCH (hereafter, "RIVER WATCH")

18  by and through its attorneys, and for its First Amended Complaint against Defendants,

19  CHEVRON U.S.A. INC., CHEVRON CORPORATION, and DOES 1-10, Inclusive (hereafter,

20  "CHEVRON"), states as follows:

21  **I.      NATURE OF CASE**

22  1.        This is a civil suit brought against CHEVRON, and as yet unidentified DOES defendants

23  under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, also

24  known as the Clean Water Act (hereafter, "CWA"), 33 U.S.C. §1251 et seq., specifically CWA

25  § 505, 33 U.S.C. §§ 1311, 1342 and 1365, to stop CHEVRON from repeated and ongoing

26  violations of the CWA.  These past and currently ongoing violations are detailed in the Notice

27  of Violations and Intent to File Suit dated July 18, 2008, (hereafter, "CWA Notice",) which is

28  made part of the pleadings of this case and attached hereto as Exhibit A.

                                        1

2.      RIVER WATCH alleges that CHEVRON, in the course of its ownership and/or operation of one or more of the underground storage tank ("UST") facilities identified in this Complaint and in the CWA Notice, is routinely violating the CWA's prohibitions against discharging a pollutant from a point source to waters of the United States without a National Pollutant Discharge Elimination System (hereafter, "NPDES") permit.  (See CWA § 301(a), 33 U.S.C. § 1311(a).)   RIVER WATCH alleges that CHEVRON has violated "effluent standards or limitations" by allowing petroleum hydrocarbons above State of California Maximum Contaminant Levels to be released and discharged into waters of the United States, and specifically into Boles Creek, Rohner Creek and/or the Eel River.

3.      RIVER WATCH alleges CHEVRON is also routinely violating the CWA's prohibition against discharging a pollutant from a point source to waters of the United States without a NPDES permit by permitting petroleum hydrocarbons and petroleum constituents to persist in soil and groundwater at each of the facilities identified in the CWA Notice by failing to comply with directives issued by the Regional Water Quality Control Board, North Coast Region, and by failing to implement an adequate Corrective Action Plan to remediate the pollution at the identified sites.

4.      Specifically, this Complaint seeks relief under the statutory provisions of the CWA for CHEVRON's discharge of pollution from current and/or former fuel dispensing facilities and the properties over which CHEVRON has past or present ownership or control identified as:

        a.      Former Unocal Bulk Plant, 359 Main Street, Fortuna, California; and

        b.      Chevron Station # 9-3476, 12 Weed Boulevard, South Weed, California;

into the waters of the State of California and the United States in violation of the above-enumerated statutes and laws.

5.      RIVER WATCH alleges that CHEVRON illegally discharges to waters of the United States which are habitat for threatened or endangered species as that term is defined by the California and the United States Environmental Protection Agency.

6.      Under 33 U.S.C. § 1251(e), Congress declared its goals and policies with regard to public participation in the enforcement of the CWA.  33 U.S.C. §1251(e) provides, in pertinent part:

2

1        Public participation in the development, revision, and enforcement of any

2        regulation, standard, effluent limitation, plan or program established by the

3        Administrator or any State under this chapter shall be provided for, encouraged,

4        and assisted by the Administrator and the States.

5   7.     This First Amended Complaint is also brought against CHEVRON under the enforcement

6   provisions of the Resource Conservation and Recovery Act (hereafter, "RCRA", 42 U.S.C. §

7   6901 et seq., specifically RCRA § 7002 (a)(1)(A), 42 U.S.C. § 6972(a)(1)(A) and RCRA §

8   7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), to stop CHEVRON from repeated and ongoing

9   violations of the RCRA. These violations are detailed in the Notices of Violations and Intent

10   to File Suit dated July 18, 2008 and April 5, 2010 (hereafter, "RCRA Notices",) which are made

11   part of the pleadings of this case and attached hereto as Exhibit B.

12   8.     Specifically, RIVER WATCH seeks relief under the provisions of the RCRA for

13   CHEVRON's discharge of pollution from current and/or former fuel dispensing facilities and

14   the properties over which it has past or present ownership or control identified as:

15        a.    Former Unocal Bulk Plant, 359 Main Street, Fortuna, California;

16        b.    Chevron Station #9-3476, 12 Weed Boulevard, South Weed, California;

17        c.    Former Chevron Station, 3135 Gibbons Drive, Alameda, California;

18        d.    Former Chevron Station, 5810 Nave Drive, Novato, California and,

19        e.    Former Chevron/Texaco Station Site, 713 Silverado Trail, Napa, California,

20   into the waters of the State of California and the United States in violation of the above-

21   enumerated statutes and laws. For purposes of this First Amended Complaint, the facilities

22   identified in Paragraph 4 and Paragraph 8 herein are hereafter referred to collectively as "the

23   Facilities".

24   9.     RIVER WATCH alleges that CHEVRON's use and storage of petroleum and other

25   pollutants at the Facilities, as described in detail in the RCRA Notices, regularly violates

26   standards, regulations, conditions, requirements or prohibitions effective pursuant to the RCRA

27   regarding storage of petroleum and like pollutants. See 42 U.S.C. § 6972(a)(1)(A).

28

10.    RIVER WATCH alleges that CHEVRON is routinely violating the RCRA's prohibition against creating an imminent and substantial endangerment to human health and the environment by its operations at the Facilities, as identified in the RCRA Notices, which operations have caused contamination of soil, groundwater and surface water. See 42 U.S.C. § 6972(a)(1)(B). Further, that pollutants at the Facilities leach into groundwater from current and former USTs which have either been removed from or abandoned at the Facilities without adequate measures taken to remove pollutants from soil and groundwater.

11.    RIVER WATCH alleges that CHEVRON is also routinely violating provisions of the Regional Water Quality Control Board, North Coast Region's  Basin Plan with respect to

   a.     Pollution remediation;

   b.     Environmental Protection Agency regulations codified in the Code of Federal Regulations;

   c.     Toxics standards promulgated by the California State Water Resource Control Board; and,

   d.     By failing to implement an adequate and comprehensive Corrective Action Plan to remediate the contamination at each of the Facilities.

12.    RIVER WATCH seeks declaratory relief, injunctive relief to prohibit future violations, the imposition of civil penalties, and other relief for CHEVRON's violations of the CWA's prohibition of discharging a pollutant from a point source to waters of the United States without a NPDES permit, for CHEVRON's violations of the RCRA's standards and regulations applicable to the use and storage of petroleum and other pollutants, and for CHEVRON's violations of the RCRA's prohibition against creating an imminent and substantial endangerment to human health and the environment.

**II.     PARTIES TO THE ACTION**

13.    Plaintiff NORTHERN CALIFORNIA RIVER WATCH, is a 501(c)(3) non-profit public benefit corporation duly organized under the laws of the State of California, with headquarters and main office located at 500 North Main Street, Suite 110, Sebastopol, California.  RIVER WATCH is dedicated to protect, enhance and help restore the surface and subsurface waters of

4

1    Northern California.   RIVER WATCH's members live in Northern California, including

2    Humboldt, Siskiyou, Alameda, Marin and Napa Counties, where the Facilities under

3    CHEVRON's operation and/or control are located.

4    14.     Members and supporters of RIVER WATCH  RIVER WATCH reside in the vicinity of,

5    derive livelihoods from, own property near, and/or recreate on, in or near and/or otherwise use,

6    enjoy and benefit from the waterways, watersheds and associated natural resources into which

7    CHEVRON discharges pollutants as alleged herein, or by which CHEVRON's operations

8    adversely affect those members' interests, in violation of  CWA § 301(a), 33 U.S.C. § 1311(a)

9    RCRA § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A) and RCRA §7002 (a)(1)(B),  42 U.S.C. §

10   6972(a)(1)(B).  Said members use the affected waters and watershed areas for domestic water,

11   recreation, sports, fishing, swimming, hiking, photography, nature walks, religious, and spiritual

12   practices, and the like.  The health, economic, recreational, aesthetic and environmental interests

13   of RIVER WATCH and its members have been, are being, and will continue to be adversely

14   affected by CHEVRON's unlawful violations as alleged herein.  RIVER WATCH contends

15   there exists injuries in fact to its members, causation of these injuries by CHEVRON's

16   complained of conduct herein, and the likelihood that the requested relief will redress these

17   injuries.

18   15.     RIVER WATCH is informed and believes and on said information and belief alleges that

19   defendant CHEVRON U.S.A. Inc. is a corporation registered in the State of California,  doing

20   business in San Ramon, California under the name of CHEVRON U.S.A. INC.

21   16.     RIVER WATCH is informed and believes and on said information and belief alleges that

22   defendant CHEVRON CORPORATION is a corporation registered in the State of California,

23   doing business in San Ramon, California under the name of CHEVRON Corporation.

24   17.     Defendants DOES 1-10, Inclusive, respectively, are persons, partnerships, corporations

25   and entities, who are, or were, responsible for, or in some way contributed to, the violations

26   which are the subject of this First Amended Complaint, or are, or were, responsible for the

27   maintenance, supervision, management, operations, or insurance coverage of the Facilities. The

28   names, identities, capacities, and functions of DOES 1-10, Inclusive, are presently unknown to

RIVER WATCH. RIVER WATCH shall seek leave of court to amend this First Amended Complaint to insert the true names of said DOES Defendants when their identities and capacities have been ascertained.

**III.    JURISDICTIONAL ALLEGATIONS**

18.    Subject matter jurisdiction is conferred upon this Court by CWA § 505(a)(1), 33 U.S.C. § 1365(a)(1), which states in part,

> "any citizen may commence a civil action on his own behalf against any person
> . . . who is alleged to be in violation of (A) an effluent standard or limitation .
> . . . or (B) an order issued by the Administrator or a State with respect to such
> a standard or limitation."

For purposes of CWA § 505, "the term 'citizen' means a person or persons having an interest which is or may be adversely affected." Subject matter jurisdiction is further conferred upon this Court by RCRA § 7002(a)(1), 42 U.S.C. § 6972(a)(1), which states in part,

> "...any person may commence a civil action on his own behalf (A) against any
> person ... who is alleged to be in violation of any permit, standard, regulation,
> condition, requirement, prohibition or order which has become effective
> pursuant to this chapter, or (B) against any person ...who has contributed or who
> is contributing to the past or present handling, storage, treatment, transportation
> or disposal of any solid or hazardous waste which may present an imminent and
> substantial endangerment to health or the environment."

19.    Pursuant to CWA § 505(b)(1)(A), 33 U.S.C. §1365(b)(1)(A), RIVER WATCH gave notice of the CWA violations alleged in this First Amended Complaint more than sixty (60) days prior to commencement of this lawsuit, to: (a) CHEVRON; (b) the United States Environmental Protection Agency, both federal and regional, and (c) the State of California Water Resources Control Board.

20.    Pursuant to CWA § 505(c)(3), 33 U.S.C. § 1365(c)(3), a copy of this First Amended Complaint shall be served on the United States Attorney General and the Administrator of the federal Environmental Protection Agency.

21.     Pursuant to RCRA § 7002 (2)(A), 42 U.S.C. §6972(2)(A), RIVER WATCH gave notice of the RCRA violations alleged in this First Amended Complaint more than ninety (90) days prior to the commencement of this lawsuit to: (a) CHEVRON, (b) the United States Environmental Protection Agency, both federal and regional, (c) the State of California Water Resources Control Board, and (d) the State of California Integrated Waste Management Board.

22.     Venue lies in the Northern District of California, pursuant to CWA §505(c)(1) , 33 U.S.C. § 1365(c)(1), and  RCRA §§ 7002(a) and (b), 42 U.S.C. §§ 6972(a) and (b), as the Facilities which RIVER WATCH contends have been and/or remain under CHEVRON's ownership and/or control and at which illegal discharges have occurred, which are the source of the violations complained of in this action, are located within this District.

## IV.     STATEMENT OF FACTS

RIVER WATCH incorporates by reference any allegations set forth above in Paragraphs 1 through 22  including the CWA Notice and the RCRA Notices as though fully set forth herein. RIVER WATCH is informed and believes, and on such information and belief alleges as follows:

23.     CHEVRON owns, operates, leases or is otherwise legally responsibility for the remediation of the Facilities, and for the remediation of the contamination at the Facilities due to the presence of petroleum hydrocarbons which have leaked or otherwise escaped from the Facilities.

24.     The Facilities have been identified as sources of pollutants which pose a threat to human health and/or to the local environment.  In the early-1970's, petroleum contamination was first detected in soil and groundwater beneath the Fortuna site in the early 1970s, beneath the Weed, Alameda and Novato sites in the mid 1980's and beneath the Napa site in 1990.  Subsequent investigation at the Facilities indicated the contamination was and is attributable to unauthorized releases from USTs and piping systems, surface spills and/or poor maintenance or operational practices.

25.     CHEVRON has stored and currently stores (at the Weed site) large quantities of petroleum products in USTs at the Facilities in a manner which has allowed significant quantities

7

of hazardous petroleum constituents, including MTBE, to be discharged to soil and groundwater beneath the Facilities, beneath adjacent properties, and into surface waters of the United States. These unauthorized discharges into soil, groundwater and surfaces waters are ongoing and continuing at the present time, creating an imminent and substantial endangerment to public health and the environment.

26.    The discharges and releases by CHEVRON as alleged herein and in the RCRA Notices are both knowing and intentional.  CHEVRON in the course of operations at the Facilities, has used, stored and sold petroleum products at the Facilities, which are known to contain benzene, toluene, TPHg, ethlybenzene, xylenes, and/or MTBE, and intends or has intended that such products be sold to and used by the public. Benzene and toluene are known carcinogens and/or reproductive toxins, and have been listed chemicals under Proposition 65 since at least 1991.

27.    CHEVRON has known of the contamination at the Facilities at least since the 1970s as noted above, and is also aware that failing to remediate the pollution allows the contamination to migrate through soil and groundwater at and adjacent to the Facilities, and to continually contaminate and re-contaminate actual and potential sources of drinking water.

28.    Regulatory agencies have ordered CHEVRON to investigate and remediate petroleum contamination at the Facilities following the discovery of petroleum releases.  CHEVRON has conducted some site investigations and remedial work in response to agency directives, however, significant levels of petroleum contamination remain in soil and groundwater beneath and adjacent to the Facilities.

29.    Based upon current levels of contamination, CHEVRON has been unsuccessful in abating the contamination.  To date, the levels of TPHg, benzene, toluene, ethylbenzene, and xylenes remain high above the State of California's allowable and established Maximum Contaminant Levels (hereafter, "MCLs") and/or Water Quality Objectives (hereafter, "WQOs") for said constituents in surface and groundwaters, creating an imminent and substantial endangerment to public health and the environment.

30.    Surface and groundwater in the areas of California in which the Facilities are located have been designated by regulatory agencies as capable of supporting domestic supply.

8

31.     The illegal discharges of pollutants and activities complained of in this First Amended Complaint occur in the waterways and watersheds identified in the CWA Notice and the RCRA Notices, all of which are waters of the United States.  The Regional Water Quality Control Board, North Coast Region, has determined those watershed areas and affected waterways are beneficially used for  drinking water, water contact recreation, non-contact water recreation, fresh water habitat, wildlife habitat, preservation of rare and endangered species, fish migration, fish spawning, industrial service supply, navigation, and sport fishing.

32.     Violations of the statutes alleged in this First Amended Complaint are a major cause of the continuing decline in water quality, and a continuing threat to existing and future drinking water supplies in Northern California. With every discharge, groundwater supplies are contaminated. These discharges can and must be controlled in order for the groundwater supply to be returned as a safe source of drinking water.

**V.      STATUTORY AND REGULATORY BACKGROUND**

**A.      Clean Water Act**

33.     CWA § 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of pollutants  from a "point source" into the navigable waters of the United States, unless such discharge is in compliance with applicable effluent limitations as set by the Environmental Protection Agency and the applicable state agency.  These limits are to be incorporated into a NPDES permit specifically for that point source.  Additional sets of regulations are set forth in the Basin Plan, California Toxics Plan, the Code of Federal Regulation and other regulations promulgated by the Environmental Protection Agency and the State Water Resources Control Board. CWA § 301(a) prohibits discharges of pollutants or activities not authorized by, or in violation of an effluent standard or limitation or an order issued by the Environmental Protection Agency or a State with respect to such a standard or limitation including a NPDES permit issued pursuant to CWA § 402,  33 U.S.C. § 1342.  The two Facilities identified in Paragraph 4 of this First Amended Complaint have been owned, operated, leased or managed by CHEVRON, and are point sources under the CWA.

34.     The affected waterways described in the CWA Notice are navigable waters of the United States within the meaning of CWA § 502(7), 33 U.S.C. § 1362(7).

35.     The Administrator of the Environmental Protection Agency has authorized the Regional Water Quality Control Board to issue NPDES permits, subject to specific conditions and requirements, pursuant to CWA § 402, 33 U.S.C. § 1342.

36.     RIVER WATCH is informed and believes and on such information and belief alleges that CHEVRON has no NPDES permit for discharging hydrocarbon contamination from its current and/or former USTs at the two Facilities identified in Paragraph 4, into waters of the United States. All unauthorized point source discharges to waters of the United States are illegal.  Each of the two Facilities is a point source.  Discharges from such point sources via tributary groundwaters to waters of the United States without a NPDES Permit are illegal.

**B.      Resource Conservation and Recovery Act**

37.     RCRA § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A) permits an action against any person who violates a PERMIT, STANDARD or REGULATION pursuant to the RCRA.  RIVER WATCH is informed and believes and on such information and belief alleges that CHEVRON has stored, handled and disposed of materials containing petroleum, petroleum constituents, and other toxic pollutants, defined as hazardous wastes under the RCRA, in a manner which has allowed these pollutants to be discharged to soil and groundwater beneath and adjacent to the Facilities in violation of regulations regarding the use and disposal of hazardous wastes. See RCRA § 3004(d), 42 U.S.C. §6924(d).

38.     RIVER WATCH is informed and believes and on such information and belief alleges that CHEVRON has violated provisions of the RCRA governing the use and operation of USTs used for the storage of petroleum products.  See RCRA subchapter IX, 42 U.S.C. § 6991 et seq.  Also, that CHEVRON has been responsible for unauthorized petroleum hydrocarbon releases at the Facilities and has removed and/or abandoned USTs on the Facilities used for the storage of petroleum without implementing required and effective cleanup and abatement measures.  At its Weed site, CHEVRON has ongoing retail petroleum delivery operations which further complicate the remediation process at that location.

39.     RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B) permits an action against any person who has contributed or who is contributing to the past or present handling of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.   RIVER WATCH is informed and believes and on such information and belief alleges that the petroleum constituents, and other pollutants, identified in the RCRA Notices, discharged at the Facilities in concentrations significantly greater than allowable MCLs and/or WQOs are hazardous wastes pursuant to RCRA § 6903(5), 42 U.S.C. § 6972 (5).  Also, that pollutants from these substances have leached into soil and groundwater beneath and adjacent to the Facilities, creating an imminent and substantial endangerment to health and the environment.

40.     RIVER WATCH is informed and believes and on such information and belief alleges that CHEVRON's point source discharges from the Facilities are not regulated by a NPDES permit in violation of the CWA's prohibition against discharge of pollutants from a point source without a NPDES permit.  The violations are established in Regional Water Quality Control Board files for the two facilities identified in Paragraph 4 herein as well as in studies conducted by or for CHEVRON in compliance with orders from the Regional Water Quality Control Board or other regulatory agencies.  The enumerated violations are detailed in the CWA Notice and designate the section of the CWA violated by the described activities.

41.     RIVER WATCH is informed and believes and on such information and belief alleges that CHEVRON's discharges to soil and groundwater as described herein and in the RCRA Notices have violated the RCRA's regulations regarding the storage and disposal of hazardous wastes. The violations are established in Regional Water Quality Control Board files for the Facilities as well as in studies conducted by CHEVRON in compliance with orders from the Regional Water Quality Control Board or other regulatory agencies.

42.     RIVER WATCH is informed and believes and on such information and belief alleges that CHEVRON's discharges to soil and groundwater as described herein and in the RCRA Notices are in violation of the   RCRA's prohibition against creating an imminent and substantial endangerment to health and the environment.  The violations are established in Regional Water

11

1    Quality Control Board and/or lead regulatory agency files for the Facilities as well as in studies

2    conducted by CHEVRON in compliance with orders from the Regional Water Quality Control

3    Board or other regulatory agencies.   The enumerated violations are detailed in the RCRA

4    Notices, incorporated herein by reference, and below.

5    **VI.    CLAIMS FOR RELIEF**

6    **A.    FIRST CLAIM FOR RELIEF**

7    **Violation of the CWA**

8    **33 U.S.C. §  1251 et seq., 33 U.S.C. § 1342 (a) and (b),  33 U.S.C. § 1311**

9    **Discharge of Pollutants from a Point Source Must be Regulated by a NPDES Permit**

10   RIVER WATCH realleges and incorporates by reference the allegations of Paragraphs

11   1 through 42 above, including the CWA Notice, as though fully set forth herein.   RIVER

12   WATCH is informed and believes and on such information and belief alleges as follows:

13   43.    CHEVRON has violated and continues to violate the CWA as evidenced by the

14   discharges of hydrocarbon pollutants from a point source without a NPDES permit in violation

15   of  CWA 301,  33 U.S.C. § 1311.

16   44.    The violations of CHEVRON are ongoing and will continue after the filing of this First

17   Amended Complaint.  RIVER WATCH alleges herein all violations which may have occurred

18   or will occur prior to trial, but for which data may not have been available or submitted or

19   apparent from the face of the reports or data submitted by CHEVRON to the Regional Water

20   Quality Control Board, or to RIVER WATCH prior to the filing of this First Amended

21   Complaint.  RIVER WATCH will file additional amended complaints, if necessary, to address

22   CHEVRON's State and Federal violations which may occur after the filing of this First

23   Amended Complaint.  Each of CHEVRON's violations is a separate violation of the CWA.

24   45.    RIVER WATCH avers and believes and on such belief alleges that without the imposition

25   of appropriate civil penalties and the issuance of appropriate equitable relief, CHEVRON will

26   continue to violate the CWA as well as State and Federal standards with respect to the discharges

27   and releases enumerated herein.  Also, that the relief requested in this First Amended Complaint

28   will redress the injury to RIVER WATCH and its members, prevent future injury, and protect

the interests of RIVER WATCH and its members which interests are or may be adversely affected by CHEVRON's violations of the CWA, as well as other State and Federal standards as alleged herein.

**B.      SECOND CLAIM FOR RELIEF**

**Violation of the RCRA**

**42 U.S.C. § 6901 et seq., specifically 42 U.S.C. § 6972(a)(1)(A)**

RIVER WATCH realleges and incorporates by reference the allegations of Paragraphs 1 through 45 above, including the RCRA Notices as though fully set forth herein. RIVER WATCH is informed and believes and on such information and belief alleges as follows:

46.      RCRA § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A) permits an action against any person who violates a PERMIT, STANDARD or REGULATION pursuant to the RCRA. Civil penalties may be assessed against any person or entity in violation of this section, under the provisions of 42 U.S.C. §§ 6928(a) and 6928(g).

47.      CHEVRON's storage and disposal of toxic levels of petroleum and petroleum constituents at the Facilities, defined as hazardous wastes under the RCRA, has caused the discharge of hazardous wastes to soil and groundwater in violation of regulations regarding the use and disposal of hazardous wastes (see RCRA § 3004 (d), 42 U.S.C. §6924(d)), and the use and operation of USTs (see RCRA § 9002(a),  42 U.S.C. § 6991(a).)

48.      RIVER WATCH avers and believes and on such belief alleges that without the imposition of appropriate civil penalties and the issuance of appropriate equitable relief, CHEVRON will continue to violate a PERMIT, STANDARD or REGULATION pursuant to the RCRA, specifically RCRA § 3004(d), 42 U.S.C. §6924(d). See RCRA § 9002(a), 42 U.S.C. §6991(a).)

49.      Continuing acts or the failures to act by CHEVRON to address these violations will irreparably harm RIVER WATCH and its members.  RIVER WATCH avers and believes and on such belief alleges that the relief requested in this Complaint will redress the injury to RIVER WATCH and its members, prevent future injury, and protect the interests of RIVER WATCH and its members which interests are or may be adversely affected by CHEVRON's violations of the RCRA, as well as other State and Federal standards as alleged herein.

13

**C.    THIRD CLAIM FOR RELIEF**

**Violation of the RCRA**

**42 U.S.C. § 6901 et seq., specifically 42 U.S.C. § 6972(a)(1)(B)**

RIVER WATCH incorporates the allegations set forth above in paragraphs 1 through 49 and the RCRA Notices as though fully set forth herein.  RIVER WATCH  is informed and believes, and on such information and belief alleges as follows;

50.    RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B) provides that any person may commence a civil action against any person or governmental entity including a past or present generator, transporter, owner or operator of a treatment, storage or disposal facility who has contributed to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or to the environment.   Civil penalties may be assessed against any person or entity in violation of this section, under the provisions of 42 U.S.C. § 6928 (a) and (g). The RCRA UST regulatory program is adopted and implemented in California under the provisions governing the Underground Storage of Hazardous Substances (California Health & Safety Code § 25280 et seq.)

51.    CHEVRON has owned and/or operated the Facilities at which it stores or has stored, and transfers or has transferred, gasoline, diesel, fuel oil and mixed oils, and is now legally responsible for the remediation of the Facilities.

52.    The Facilities contain USTs which are either leaking or in the past have leaked (before being removed or replaced), petroleum chemicals including benzene, toluene, TPHg, ethylbenzene, xylenes, and MTBE into groundwater.  Or, petroleum products have been washed off the Facilities into nearby surface waters and groundwaters.  For purposes of the RCRA, petroleum products and their constituents: TPHg, benzene, toluene, ethylbenzene, xylenes, and MTBE, are both "solid wastes" and "hazardous wastes" within the meaning of the statute.

53.    Petroleum products and constituent chemicals within these petroleum products such as benzene and toluene (known carcinogens and/or reproductive toxins), are known to be hazardous

14

1   to the environment, and if released into the environment in sufficient quantity pose an imminent

2   and substantial risk to public health and to the environment.

3   54.     The amounts of petroleum products and their constituents, TPHg, benzene, toluene,

4   ethylbenzene, xylenes, and/or MTBE, released by CHEVRON at the Facilities are in sufficient

5   quantity to pose an imminent and substantial risk to both the environment and to human health.

6   55.     Continuing acts or failure to act by CHEVRON to address these violations of the RCRA

7   will irreparably harm RIVER WATCH and its members, for which harm they have no plain,

8   speedy or adequate remedy at law.   RIVER WATCH avers that the relief requested in this

9   Complaint will redress the injury to RIVER WATCH and its members who are or may be

10  affected by the violations alleged herein.

11  **VII.    PRAYER FOR RELIEF**

12          WHEREFORE, RIVER WATCH, respectfully requests this Court grant the following

13  relief:

14  56.     Declare CHEVRON to have violated and to be in violation of the CWA with respect to

15  the two Facilities identified in Paragraph 4 of this First Amended Complaint;

16  57.     Issue an injunction ordering CHEVRON to immediately clean up and abate the two

17  Facilities identified in Paragraph 4 of this First Amended Complaint in compliance with the

18  CWA and applicable State and Federal standards;

19  58.     Order CHEVRON to pay to the U.S. Treasury civil penalties of $27,500.00 per violation/

20  per day for each of its violations of the CWA;

21  59.     Declare CHEVRON to have violated and to be in violation of the RCRA for discharging

22  from the Facilities petroleum products and constituents which are known carcinogens and/or

23  reproductive toxins in sufficient quantities to pose an imminent and substantial risk to health and

24  to the environment;

25  60.     Enjoin CHEVRON from discharging petroleum products and petroleum constituents from

26  the Facilities, which petroleum products and constituents pose an imminent and substantial risk

27  to health and the environment;

28

15

61.     Order CHEVRON to comply with all of the substantive and procedural requirements of the RCRA with respect to the Facilities;

62.     Order CHEVRON to pay civil penalties of up to $37,500.00 per violation/per day to the U.S. Treasury, for each of the Facilities, pursuant to applicable provisions of the RCRA including  42 U.S.C. §§ 6928(a) and 6928(g), and/or to pay for remediation projects to redress the harm caused by CHEVRON's violations of RCRA as alleged herein.  Each of the above-described violations of the RCRA subjects the violator to a civil penalties on a per day/per violation basis.  Civil penalties may be assessed for violations occurring within five (5) years prior to the initiation of a citizen enforcement action;

63.     Enter such preliminary injunctions, permanent injunctions or other orders pursuant to the RCRA requiring CHEVRON to enjoin and abate the nuisance resulting from the discharges and releases of petroleum products and constituents from the Facilities, and to enjoin the migration of petroleum products and constituents into soil and groundwater at and surrounding the Facilities;

64.     Impose injunctive relief requiring CHEVRON to immediately investigate, access and categorize the extent of pollution and implement the "best available technology" to remediate pollution at the Facilities;

65.     Impose injunctive relief requiring CHEVRON to immediately commence complete remediation of the contamination at and adjacent to the Facilities once the contaminant plumes have been adequately characterized;

66.     Award costs and fees (including reasonable attorney, expert, witness, and consultant fees) to RIVER WATCH as authorized by both the CWA and the RCRA; and,

67.     Award such other relief as this Court may deem appropriate.


DATED: July 14,  2010                        /s/ Jack Silver
                                             _____
                                             Jack Silver
                                             Attorney for Plaintiff
                                             NORTHERN CALIFORNIA RIVER WATCH

16

# EXHIBIT   A

# Law Office of Jack Silver



P.O. Box 5469       Santa Rosa, California 95402
Phone  707-528-8175      Fax  707-528-8675
lhm28843@sbcglobal.net

*Via Registered Mail - Return Receipt Requested*

July 18,  2008

David J. O'Reilly, CEO and President
Chevron Corporation
6001 Bollinger Canyon Road
San Ramon, CA 94583-2324

Gary P. Luquette, President
Chevron U.S.A., Inc.
6001 Bollinger Canyon Road
San Ramon, CA 94583

**Re:    Notice of Violations and Intent to File Suit Under the Clean Water Act**

Dear Mr. O' Reilly and Mr. Luquette:

## 1.      Notice Under the Clean Water Act

Clean Water Act § 505(b), 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Clean Water Act § 505(a), 33 U.S.C. §1365(a),  a citizen must give notice of intent to sue to the alleged violator, the Environmental Protection Agency, and the State in which the violations occur.

On behalf of Northern California River Watch ("River Watch"), I am providing statutory notification to the Chevron Corporation and Chevron U.S.A., Inc. (hereafer "Chevron"), of River Watch's intention to initiate a civil action in federal court under the provisions of the Clean Water Act, 33 U.S.C. § 1251 et seq., in conjunction with Chevron's continuing operations at several of its Northern California current and former underground storage tank ("UST") sites as further identified in this Notice.

The Clean Water Act ("CWA") regulates the discharge of pollutants into waters of the United States. The statute is structured in such a way that all discharges of pollutants are prohibited with the exception of certain enumerated discharges such as those for which a National Pollutant Discharge Elimination System ("NPDES") permit has been issued.  Citizen suits for violations of provisions of the CWA are authorized under 33 U.S.C. § 1365, following a notice that conforms to the requirements of subpart (b) of that section.

River Watch hereby places Chevron on notice that following the expiration of sixty (60) days from the date of this Notice, River Watch intends to bring suit in federal District Court against Chevron for Chevron's continuing violations of an "effluent standard or limitation", "permit, condition or requirement and/or an order issued by the Administrator or a State with respect to such standard or limitation", under CWA § 505(a)(1), 33 U.S.C. § 1365(a)(1), and/or the Code of Federal Regulations, and/or the Basin Plan as adopted by the Regional Water Quality Control Board, by allowing petroleum hydrocarbons above State of California Maximum Contaminant Levels to be released and discharged into waters of the United States, specifically into Crow Creek (see site #1 below), into Boles Creek (see site #4 below), into Rohner Creek and/or the Eel River (see site #6 below), and other such surface waters as further investigation may disclose, without the benefit of any NPDES or other permit authorizing such discharges.

This Notice also addresses Chevron's failure to comply with the terms and conditions of California's General Industrial Storm Water Permit for Industrial Storm Water Discharges (WDID 228S003380), its illegal discharges of contaminated storm water from the service station sites identified in this Notice, its discharges of non-storm water pollutants from those sites in violation of effluent limitations, and its apparent violations of the procedural requirements of NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 97-03-DWQ and Water Quality Order No. 91-13-DWQ (as amended by Water Quality Order 92-12-DWQ) issued pursuant to CWA § 402(p), 33 U.S.C. § 1342(p) ("General Permit").

The activities and unauthorized discharges leading to these CWA violations are more fully described below with regard to each of the identified sites.   Chevron is responsible for the CWA violations based upon its own conduct at each of the sites, and/or because Chevron has assumed legal responsibility to remediate one or more of the identified sites in situations where previous site owners or operators may have contributed to unauthorized discharges.

The dates of the violations correspond with the dates of each initial unauthorized release at each of the sites identified, although following each release the downgradient surface waters would not have been immediately impacted, but would have been contaminated at later dates consistent with the rate of offsite plume migration from each site through conduits or other preferential pathways or via surface migration of petroleum contamination during heavy rain events.

The violations set forth herein are alleged to be continuing in nature in that the sources of pollution impacting surface waters have not been eliminated to date.  Pursuant to CWA § 309(d), 33 U.S.C. § 1319(d), each of the violations described herein subjects the violator to a penalty of up to $27,500 per day per violation for each of the violations occurring within the five (5) year period prior to the initiation of a citizen enforcement action.  In addition to civil penalties paid to the U.S. Treasury, River Watch will seek injunctive relief in the interest of preventing further violations of the CWA pursuant to CWA § 505(a) and § 505(d), 33 U.S.C. §1365(a) and §1365(d), and such other relief as is permitted by law.  CWA §505(d), 33 U.S.C. §1365(d) also permits prevailing parties to recover costs and reasonable attorney fees.

II.     **Identification of Chevron Sites**

1.      **Former Chevron Service Station  #9-5607**
        **5269 Crow Canyon Road, Castro Valley, California**

This former Chevron service station site is located at the intersection of Crow Canyon Road and Waterford Place in an area of residential properties.  The real property on which the service station is situated is currently owned by Kevin and Julie Hinkley.

This site functioned as a gasoline service station between approximately 1963 and 1990.  In 1985 a discrepancy in inventory was detected leading to the discovery of a leak in the station's product storage and delivery system.  A review of inventory records later established that approximately 670 gallons of gasoline had been released from the leaking system in the previous 5 months.  After the unauthorized release was reported, 18 monitoring wells were eventually installed, 15 of which continue to be monitored.  In October of 1990, the USTs were removed after the station was closed. The site is now occupied by an auto repair facility which has one 550 gallon UST for used oil.

A Corrective Action Plan was not submitted until May of 2000.  At that time pure product (NAPL) had to be bailed out of one or more of the monitoring wells on a bi-weekly basis.  NAPL levels since 2002 have been recorded at between 0.03 and 0.47 feet in thickness at monitoring well C-3.  The contaminant plume was determined to be approximately 200 feet in length in a downgradient direction towards Crow Creek.  Due to the proximity of Crow Creek to the site (45 feet east of monitoring well C-15 which is within the extent of the plume), there is serious concern that contaminated groundwater from the site has impacted the Creek, although the Creek itself apparently has not been tested for contamination.

In late 2002 a former engineering consultant recommended a two-phase extraction process to remediate the site.  More recent evaluations have determined that a dual-phase system may have been planned for implementation (if found feasible) sometime in late 2007, 22 years after the initial release was discovered.

Records available for this site do not reflect whether engineering consultants have determined if sensitive receptors in the immediate area of the plume have been affected by the extent of pollution in adjacent soil and groundwater.  In addition, there are no apparent preferential pathways studies, and no data indicating an aquifer impact assessment has been conducted.  At the present time (based upon 3rd quarter monitoring), TPHg levels are as high as 56,000 ug/l, benzene is as high as 12,000 ug/l, and toluene is as high as 660 ug/l.  Crow Creek has apparently not been tested for petroleum hydrocarbons.  In August of 2005, the Alameda County Health Care Services oversight specialist for this site indicated,  the " . . . plume. . . has migrated beneath the adjacent townhomes and likely impacted the downgradient creek."  Other than initial over-excavation associated with the removal of the USTs in1990, no remediation has been initiated since approximately 1987.

Accordingly, this is a situation for which River Watch must rely upon federal statutory provisions which authorize citizen suits when regulatory agency processes have not resulted in viable and timely solutions to the petroleum contaminant problems in Northern California communities.

2. **Former Chevron Station #9-3203**
   **2026 North Texas Street, Fairfield, California**

This site is located on North Texas Street, south of Pacific Avenue, in a mixed area of residential and commercial properties. The site operated as a Chevron service station between 1971 and 1995 at which time Chevron's lease expired. In August of 1995 the product storage and dispensing facilities were removed from the site. At the present time the site continues as a gasoline station occupied by an active American Energy service station. The real property on which the service station is situated is owned by Andree A. Benson.

A Shell service station currently exists at 1990 North Texas Street, some 300 feet to the south of the site. The two sites have combined plumes which are monitored jointly by Gettler-Ryan and Blaine Tech Services. Separate phase hydrocarbons (LNAPL) have been recorded at MW-3 from 1993 to 2005, but apparently none since that time.

The first reported release occurred in approximately 1983 followed by the installation of monitoring wells during that year. However, subsurface soil investigation was not conducted until 1993. Other than initial over-excavation work, very little remediation has occurred over the past 24 years. Consultant's reports indicate the site is defined laterally, and that vertical delineation has been completed below 15 ft. bgs; however, there is no indication that an aquifer impact assessment has been accomplished.

In 1999 Chevron's engineering consultant Cambria completed a sensitive receptor survey, relying upon Department of Water Resources records to determine whether there were any threatened receptors within 2,000 feet of the site. The survey found no surface waters, domestic wells, hospitals, or schools. In March of 2001 a conduit study revealed that the North Aquaduct which runs down North Texas Street adjacent to sewer and water lines could act as a migratory pathway for hydrocarbons. The potential for plume migration along this Aquaduct was not deemed particularly great, and field testing was apparently not done.

Cambria has admitted in its RAP that monitored natural attenuation cannot remediate this site within a reasonable period of time. Relying upon a cost analysis, Cambria has determined that over-excavation would be too disruptive of ongoing business activity at and adjacent to the site. Thus, even though over-excavation would probably be the most effective means to eliminate the source of soil and groundwater pollution and the threat to the surrounding environment, Cambria recommends two-phase extraction as the most cost effective strategy for site cleanup.

At the present time (based upon October 2007 monitoring), the site has extremely high levels of petroleum hydrocarbons – as high as 120,000 ug/l at one of the wells, and 63,000 ug/l at another. Benzene has recently been found to be as high as 15,000 ug/l, and toluene as high as 10,000 ug/l. River Watch therefore remains concerned that the high levels of contaminants demand much more proactive remediation work than Cambria has recommended, and believes it is essential to actually test any likely preferential pathways (such as the Aquaduct) for the presence of contamination. In addition, River Watch would prefer that excavation of affected soil at the site be accomplished in order to eliminate the ongoing threat to groundwater. River watch also recommends that data be developed which attempts to determine the residual mass of contaminant within the plume so that

some ongoing objective measure of remediation progress might be provided along with estimates of an eventual closure date.

River Watch believes Chevron must work much more proactively to neutralize the soil and groundwater beneath and around the site by employing best available technology as required by the Basin Plan adopted by the Regional Water Quality Control Board. Given the relatively shallow depth of the plume, the best available technology seems to be further excavation.

### 3.   Former Chevron Service Station #9-2759
### 801 El Camino Real, San Bruno, California

This site is one of three former service stations located at the intersection of El Camino Real and San Bruno Avenue which have been the location of gasoline sales for over 50 years. A Shell branded station was situated at 798 El Camino Real; an ExxonMobil (now Valero) station existed at 800 El Camino Real; and, Chevron had operated at 801 El Camino Real. The real property on which the Chevron station is situated is currently owned by Peter Chang and the G.W. Williams Company.

The first reported release was in 1987. In the following year the USTs were removed along with an undisclosed amount of impacted soil. Groundwater extraction and treatment commenced between 1991 and 1996, but the process removed only approximately 340 pounds of petroleum hydrocarbons with the filtering of over 2,000,000 gallons of groundwater. Quarterly groundwater monitoring occurred between 1989 and 2001 followed by semiannual monitoring from 2002 to the present. Finally in 2007, pilot testing occurred to determine the feasibility of specific remediation processes.

Currently, the work at the Chevron site is combined with petroleum contaminant monitoring at the adjacent Valero and Shell sites. As the plumes are commingled, one engineering consulting firm (Resource Environmental, LLC) is supervising the monitoring work at all three sites.

The commingled plume lies approximately 2,000 feet west of the San Francisco Bay. Groundwater flows east-southeast towards the Bay in an area of high hydraulic conductivity, where groundwater velocity can range as much as 300 feet per year. Four private irrigation wells have been located within 2,500 feet of the site, one as close as 720 feet to the east. Low levels of hydrocarbon impact have been detected in three of these four wells. In addition to groundwater contamination from the Chevron site, potential vapor impacts to the nearby residential units have been identified at the adjacent sites.

At the present time, 20 years after the first reported release, the lateral and vertical characterization of the commingled plume is still being assessed. The MTBE plume extends at least 400 feet downgradient from the Chevron site. Remediation of the Chevron site awaits a decision as to the most cost-effective cleanup method given the conditions. Meanwhile, groundwater concentrations of TPHg are as high as 43,000 ug/l as of the last available monitoring records of July of 2007. Benzene is as high as 7,300 ug/l, and toluene as high as 7,600 ug/l.

River Watch remains concerned that this is another site for which remediation efforts have long been deferred while regular contaminant monitoring has taken over as the principal activity. This site

continues to represent an immediate threat to domestic water supplies and environmental degradation by infiltration into San Francisco Bay.

River Watch seeks Chevron's use of the best available technology to insure that no surface water, aquifer or groundwater is further contaminated by this plume. River Watch would like to insure that the full delineation of the plume is accomplished without further delay; and would like to review current sensitive receptor and preferential pathway survey results.

### 4. Current Chevron Service Station #9-3476
### 12 Weed Boulevard South, Weed, California

This site is located at the intersection of Weed Boulevard South (Highway 97) and Main Street in an area of mixed residential and commercial properties. The site is a currently active Chevron-branded service station adjacent to several other service station facilities including an active Shell branded service station, and former ARCO and Union 76 stations. The real property on which the service station is situated is currently owned by the Mountain Supply Company of Redding, CA.

The first unauthorized release of petroleum hydrocarbons was detected in 1985 when the USTs were upgraded. In the following year monitoring wells were installed. In 1987 groundwater extraction was commenced in an attempt to remediate the soil and impacted groundwater. By August of 1996, with the extraction of over 3,200,000 gallons of groundwater, approximately 350 pounds of dissolved-phase hydrocarbons were removed along with 140 gallons of separate phase hydrocarbons (SPH or NAPL). A soil vapor extraction system was initiated in 1991 and ran intermittently until 2000 when it was deactivated due to poor hydrocarbon removal rates. The reports indicate the soil vapor extraction system removed only approximately 110 pounds of hydrocarbons as gasoline.

Engineering consultant Cambria initiated a two-phase extraction pilot test in 2004 to determine if such extraction processes would be feasible. The test established that two-phase extraction would be ineffective for the soil conditions.

Groundwater lies at between 6 and 20 feet bgs. It flows generally northward towards Boles Creek which is considered an 'at risk' sensitive receptor at approximately 300 to 400 feet downgradient to the north. NAPL has been detected in 2 of the monitoring wells since 2000. During the current quarter, approximately 0.50 gallons of LNAPL and water were removed from these wells by hand bailing.

At the present time very high levels of contamination are present in the wells. TPHd concentration levels are as high as 37,000 ug/l. TPHg levels were recorded at 38,000 ug/l in May of 2007. Toluene is currently as high as 760 ug/l, while benzene is virtually non-detect. There is no active remediation taking place to deal with the high levels of subsurface contamination. Engineering reports indicate that contaminant concentrations tend to diminish rapidly below 15 ft bgs, but there has been no recommendation to employ over-excavation to remove the contamination despite the infeasibility and ineffectiveness of the other remediation systems which been tried. It appears Chevron would prefer to continue its economic operations at this location while only monitoring and analysis occurs, regardless of the eventual environmental impact of plume migration.

The reports on file do not provide sensitive receptor survey information, nor do they recount whether conduit studies or preferential pathway studies have been conducted. In addition, there seems to be no information as to whether any aquifer impact assessment has been done. No data has been provided to assess the residual contaminant mass in the plume in order to have a benchmark against which the progress of further remediation might be gauged.

This, then, is another site for which River Watch believes that Chevron has failed to employ the best available technology towards the goals of full remediation.

5.      **Chevron Service Station #9-3751**
        **5502 Thornton Avenue, Newark, California**

This is an active service station site located on the southwest corner of Thornton Avenue and Cedar Boulevard. It lies in a commercial corridor, adjacent to a shopping center with small businesses nearby and residential properties south of the shopping center. The real property on which the service station is situated is currently owned by Jose and Marlu Vasquez.

A Chevron station was erected at the site in 1964. The original USTs were removed in 1978 during upgrading operations. Chevron sold the station in 1997 and it has been subsequently redeveloped as an independent service station.

The Alameda County Water District operates 2 municipal supply wells in the Newark Aquifer. The Darvon 1 well lies approximately 1,600 feet to the northeast of the site. The Cedar 2 well is located approximately 2,200 feet to the southeast. Groundwater is extracted from both municipal wells at rates of 3,300 gpm and 2,500 gpm respectively. The Aquifer has a relatively high hydraulic conductivity of 920 ft/day under pumping conditions due to the high permeability of the local soils. As a result, groundwater flow directions are influenced by the County's pumps. This influence affects the groundwater in and around the site. The Cedar 2 pump for example, will exert a draw-down of 3.2 feet in the groundwater of the site after being in operation for 8 days following a shut down period. The radius of influence of both of the municipal pumps is almost 6,000 linear feet.

The first leak at this site was reported in 1993. A site assessment was commenced in December of 1997. TPHg, BTEX, MTBE, TAME and TBA have been detected in groundwater. TPHg levels as recently as January of 2008 have been as high as 40,000 ug/l. Toluene is as high as 1,500 ug/l. MTBE is as high as 930 ug/l. Benzene is at 300 ug/l.

While Alameda County is rightfully concerned about the impact of the site's plume upon the municipal water which is delivered to its residents by its water supply system; and, while there must be adequate oversight concerning the progress of remediation, River Watch remains concerned that some of the more obvious remedies to the situation have yet to be recommended.

Perhaps because the site no longer belongs to Chevron, there is an interest in allowing the current owners to continue the business of gasoline sales. This seems to be another example, however, of deference to business interests as opposed to environmental concerns. Chevron's consultant takes the position that "(q)uarterly groundwater monitoring is proposed as an interim corrective action for the Newark Aquifer."

The reports provided by the consultant do not recommend any remediation process which would eliminate the threat to the Alameda County water supply. Such reports do not seem to investigate likely conduits or preferential pathways beneath the site, nor do they advance the recommendation that further excavation work to remove affected soils would likely remove threats to the environment. If current sensitive receptor surveys exist and conduit studies are available, River Watch would like to be provided with copies as part of its involvement in this matter. Beyond the delineation of this site, it seems pertinent to determine the mass of residual contamination so that some remediation timeline might be provided as a means of assessing the progress of clean up.

6. **Former Unocal Bulk Plant**
   **359 Main Street, Fortuna, California**

This former Unocal bulk plant is located on a one-acre vacant lot in an industrial section of Fortuna. The site is bordered on the north by Main Street, to the south by railroad tracks, to the east by vacant land, and to the west by a former Chevron bulk plant. This site was utilized as a bulk storage facility from approximately 1924 to 1964. The first petroleum impact was detected in approximately 1974. The real property on which the plant is situated is currently owned by Larry and Frances Montgomery.

Gasoline and diesel constituents have impacted soil and groundwater at the site as a result of releases in 1974 and 1978, the latter of which apparently led to several explosions in February of 1978 – one in a bowling alley related to gasoline vapors emanating from the Unocal site along sewer lines beneath Main Street. Various other releases are presumed to have occurred over the years due to bulk fuel operations. Regulatory agencies first received reports of soil and groundwater impacts in approximately 1988. Following contact by the North Coast Regional Water Quality Control Board in 1990, over-excavation to the extent of 2,700 tons of impacted soil was finally accomplished between 1997 and 2000.

Monitoring wells were installed beginning in 1991. Concentrations of contaminants have been measured since that time. NAPL was found at one of the wells (MW-4) as recently as 2002. In 1993 soil vapor extraction pilot testing determined that due to soil composition, vapor extraction might not be feasible. Further excavation work was done in 1997 after visual and olfactory indications of petroleum prompted specific areas of soil removal. Over the course of the next several years, 1,600 tons of impacted soil was placed on plastic. Finally in 2002 the soil was removed after the engineering consultant was advised by the Regional Water Quality Control Board that this soil could not be used as backfill, but had to be shipped to a landfill facility, and that clean backfill had to be imported to the site.

The site lies in the Eel River Valley. The Eel River is approximately 600 feet to the southwest, while Rohner Creek lies approximately 500 feet to the northeast. The shallow aquifer zone flows generally towards the south/southwest (towards the Eel River), while the deep aquifer zone at the site flows towards the east (towards Rohner Creek).

Fortuna is supplied by municipal water from 3 wells located on Eel River Drive, several miles from the site. The shallow groundwater at the site has a designated beneficial use as a drinking water supply in the North Coast Water Quality Control Board's Basin Plan. No sensitive receptor survey

has apparently been conducted to determine whether there are private domestic wells at risk from the site's plume.  A multi-phase extraction pilot test was initiated in 2005.  The soil composition does not, however, seem conducive for the removal of residual contaminants.

This site remains problematic due to the recalcitrance of the soils to contemporary methods of subsurface remediation processes.  The contaminated areas of this former plant are laterally extensive, but seem to be limited to vertical depths above 20 feet bgs.  In view of the persistently high concentrations of petroleum constituents (based on August, 2007 monitoring – 72,000 ug/l for TPHg; 7,300 ug/l for TPHd; 11,000 ug/l for toluene, and 6,800 for benzene) it would seem that further excavation work is essential to remove the environmental risks this site represents.  Chevron's consultant seems content to do little more than investigate and monitor while this plume continues to migrate downgradient towards surface waters.

As with the other sites listed above, River Watch believes Chevron must take its remediation work much more seriously at this site and conduct preferential pathway studies and conduit studies to determine whether the Main Street sewer continues to provide offsite access for contaminants including harmful vapors, and an aquifer impact assessment.  While records may no longer exist to determine the residual contamination based upon lost inventories, certainly with existing soil density data, an integration calculation can be done to compute the mass of the plume.  This would provide a basis for determining removal progress – if active remediation ever takes place.

## III.      Regulatory Standards

Water Quality Objectives exist to ensure protection of the beneficial uses of water.  Several beneficial uses of water exist.  The most stringent water quality objectives for protection of all beneficial uses are selected as the protective water quality criteria. Alternative cleanup and abatement actions need to be considered that evaluate the feasibility of, at a minimum: (1) cleanup to background levels, (2) cleanup to levels attainable through application of best practicable technology, and (3) cleanup to protective water quality criteria levels. Existing and potential beneficial uses of area groundwater include domestic, agricultural, industrial and municipal water supply.

## IV.      Violations

Between approximately the year 2003 and the date of this Notice, Chevron has caused or permitted, causes or permits, or threatens to cause or permit, petroleum contaminants, petroleum constituents and other hazardous wastes to be discharged or deposited where it is, or probably will be, discharged into waters of the State and now creates, or threatens to create, a condition of pollution or nuisance. This Notice covers the statutory period of limitations to date running from July 18, 2003 through July 18, 2008.  The discharge and threatened discharge of such petroleum waste is deleterious to the beneficial uses of water, and is creating and threatens to create a condition of pollution and nuisance which will continue unless the discharge and threatened discharge is permanently abated.

The provisions of the CWA govern the discharges of hazardous substances, including petroleum hydrocarbons, into surface waters of the United States.

Chevron's use and storage of petroleum at the 6 sites identified above has allowed significant quantities of hazardous petroleum constituents to be released or discharged into soil and groundwater in violation of the provisions of the CWA and California's UST regulatory programs including, but not limited to provisions governing general operating requirements for USTs, release detection and prevention requirements, release reporting and investigation requirements, and release response and corrective action requirements. Such discharges have been allowed to impact waters of the United States in violation of the CWA.

The violations of the CWA as alleged in this Notice are knowing and intentional in that Chevron has used, stored and sold petroleum products at the 6 sites identified above which are known to contain hazardous substances, and it has intended that such products will be sold to and used by the public. Chevron has known of the contamination since at least 2003, and has also known that failing to promptly remediate the pollution allows the contamination to migrate through soil and groundwater at and adjacent to the sites, and to continually contaminate and re-contaminate actual and potential sources of drinking water as well as surface waters.

The type of violations of the CWA alleged herein are a major cause of the continuing decline in water quality and pose a continuing threat to existing and future drinking water supplies of Northern California. With every discharge, groundwater supplies are contaminated. These discharges can and must be controlled in order for the groundwater supply to be returned to a safe source of drinking water.

In addition to the violations set forth above, this Notice is intended to cover all of Chevron's violations of the CWA at the 6 sites identified above evidenced by information which becomes available to River Watch after the date of this Notice.

## V.      Identification of Northern California River Watch

The entity bringing this Notice is Northern California River Watch, a non-profit corporation dedicated to the protection and enhancement of the waters of the State of California including all rivers, creeks, streams and groundwater in Northern California. River Watch is organized under the laws of the State of California. Its address is 6741 Sebastopol Avenue, Suite 140, Sebastopol, CA, 95472 - telephone (707) 824-4372.

Chevron's violations of the CWA as set forth in this Notice affect the health and enjoyment of members of River Watch who reside and recreate in the affected watershed areas. Those members use the watershed for domestic water supply, agricultural water supply, recreation, sports, fishing, swimming, shellfish harvesting, hiking, photography, nature walks and the like. Their health, use and enjoyment of these natural resources are conditions specifically impaired by the violations of Chevron alleged in this Notice.

## VI.     Contact Information

River Watch has retained legal counsel with regard to the issues raised in this Notice. All communications should be addressed as follows:

Jack Silver, Esquire
Law Office of Jack Silver
P.O. Box 5469
Santa Rosa, CA 95402-5469
Tel. (707) 527-8175
Fax (707) 527-8675

**VII.   Conclusion**

River Watch believes this Notice sufficiently states the grounds for filing suit under the statutory and regulatory provisions of the CWA as to the sites referenced above.  At the close of the notice period or shortly thereafter, River Watch intends to file a suit against Chevron and the individual real property owners and/or site operators under the provisions of the CWA for each of the violations as alleged herein.  River Watch is willing to discuss effective remedies for the violations referenced in this Notice, and encourages Chevron, if it so wishes, to initiate those discussions immediately so that we might be on track to resolving the issues before the end of the notice period. River Watch will not delay the filing of a lawsuit if discussions have not commenced by the time the notice period ends.

Very truly yours,

Jack Silver

JS:lha
cc:
Stephen L. Johnson, Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Wayne Nastri, Regional Administrator
U.S. Environmental  Protection Agency, Region 9
75 Hawthorne St.
San Francisco, CA 94105

Dorothy R. Rice, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California  95812-0100

Mark Leary, Executive Director
Calif. Integrated Waste Management Board
1001 "I" Street
Sacramento, CA 95814

The Prentice-Hall Corporation System, Inc.
Registered Agent for
Chevron Corporation
Chevron U.S.A, Inc.
P.O. Box 526036
Sacramento, CA 95852

Kevin and Julie Hinkley [Site #1]
5269 Crow Canyon Road
Castro Valley, CA 94552

Andree A. Benson [Site #2]
34 Creekridge Court
San Mateo, CA 94402

Peter Chang [Site #3]
G.W. Williams Company
3190 Clearview Way
San Mateo, CA 94402-3752

Mountain County Supply Co. [Site #4]
P.O. Box 491687
Redding, CA 96049

Jose and Marlu Vasquez [Site #5]
37201 Aleppo Drive
Newark, CA 94560

Larry and Frances Montgomery [Site #6]
P.O. Box 285
Houston, TX 77007-0285

Station operator
5502 Thornton Avenue
Newark, CA 94560

Station operator
12 Weed Boulevard South
Weed, CA 96094

Robert C. Goodman, Esquire
Rogers Joseph O'Donnell
311 California Street
San Francisco, CA 94104-2695

# EXHIBIT   B

# Law Office of Jack Silver



P.O. Box 5469        Santa Rosa, California 95402
Phone  707-528-8175     Fax  707-528-8675
lhm28843@sbcglobal.net

*Via Registered Mail - Return Receipt Requested*

July 18, 2008

David J. O'Reilly, CEO and President
Chevron Corporation
6001 Bollinger Canyon Road
San Ramon, CA 94583-2324

Gary P. Luquette, President
Chevron U.S.A., Inc.
6001 Bollinger Canyon Road
San Ramon, CA 94583

**Re:**   **Notice of Violations and Intent to File Suit under the  Resource Conservation
and Recovery Act**

Dear Mr. O'Reilly and Mr. Luquette:

## I.   Notice Under the Resource Conservation and Recovery Act

The Federal Resource Conservation and Recovery Act ("RCRA") 42 U.S.C. § 6901 et seq., requires
that sixty (60) days prior to the initiation of an action for violation of permit, standard, regulation,
condition, requirement, prohibition or order effective under RCRA, a private party must give notice
of the violation to the alleged violator, the Administrator of the U.S. Environmental Protection
Agency and the State in which the violation is alleged to have occurred (42 U.S.C. § 6972(b)(1)(A)).
The RCRA also requires that a private party must provide ninety (90) days prior notice to the alleged
violator, the Administrator of the Environmental Protection Agency and the State in which the
violation is alleged to have occurred before initiating an action for an imminent and substantial
endangerment to human health or the environment. (42 U.S.C. § 6972(b)(2)(A)).

On behalf of Northern California River Watch ("River Watch"), I am providing statutory notification
to the Chevron Corporation and Chevron U.S.A., Inc. (hereafter "Chevron") of continuing and
ongoing violations of the RCRA in conjunction with Chevron's operations of the Northern
California underground storage tank ("UST") sites as further identified in this Notice.

By copy of this Notice I am also providing notice of these same violations to each of the owners of the real property on which the current and former service stations are or were situated.  Under the provisions of the RCRA, the current owners of real property contributing to environmental pollution may be legally responsible for damages related to such pollution and its costs of remediation.

River Watch hereby notifies Chevron that at the expiration of the appropriate notice periods under the RCRA, River Watch intends to commence a civil action against Chevron on the following grounds:

1.     Chevron's use and storage of petroleum products at the gasoline station sites identified in this Notice has and continues to violate permits, standards, regulations, conditions, requirements and/or prohibitions effective pursuant to the RCRA regarding storage of petroleum in underground storage tanks ("USTs") [42 U.S.C. § 6972(a)(1)(A)];

2.     Chevron's operations at the gasoline station sites identified in this Notice have caused and continue to cause petroleum contamination of soil and groundwater which presents an imminent and substantial endangerment to human health and the environment [42 U.S.C. § 6972(a)(1)(B)].

## II.   Identification of Chevron Sites

### 1.     Former Chevron Service Station  #9-5607
### 5269 Crow Canyon Road, Castro Valley, California

This former Chevron service station site is located at the intersection of Crow Canyon Road and Waterford Place in an area of residential properties.  The real property on which the service station is situated is currently owned by Kevin and Julie Hinkley.

This site functioned as a gasoline service station between approximately 1963 and 1990.  In 1985 a discrepancy in inventory was detected leading to the discovery of a leak in the station's product storage and delivery system.  A review of inventory records later established that approximately 670 gallons of gasoline had been released from the leaking system in the previous 5 months.  After the unauthorized release was reported, 18 monitoring wells were eventually installed, 15 of which continue to be monitored.  In October of 1990, the USTs were removed after the station was closed. The site is now occupied by an auto repair facility which has one 550 gallon UST for used oil.

A Corrective Action Plan was not submitted until May of 2000.  At that time pure product (NAPL) had to be bailed out of one or more of the monitoring wells on a bi-weekly basis.  NAPL levels since 2002 have been recorded at between 0.03 and 0.47 feet in thickness at monitoring well C-3.  The contaminant plume was determined to be approximately 200 feet in length in a downgradient direction towards Crow Creek.  Due to the proximity of Crow Creek to the site (45 feet east of monitoring well C-15 which is within the extent of the plume), there is serious concern that

contaminated groundwater from the site has impacted the Creek, although the Creek itself seems not to have been tested for contamination.

In late 2002 a former engineering consultant recommended a two-phase extraction process to remediate the site. More recent evaluations have determined that a dual-phase system may have been planned for implementation (if found feasible) sometime in late 2007, 22 years after the initial release was discovered.

Records available for this site do not reflect whether engineering consultants have determined if sensitive receptors in the immediate area of the plume have been affected by the extent of pollution in adjacent soil and groundwater. In addition, there are no apparent preferential pathways studies, and no data indicating an aquifer impact assessment has been conducted. At the present time (based upon 3rd quarter monitoring), TPHg levels are as high as 56,000 ug/l, benzene is as high as 12,000 ug/l, and toluene is as high as 660 ug/l. Crow Creek has apparently not been tested for petroleum hydrocarbons. In August of 2005, the Alameda County Health Care Services oversight specialist for this site indicated, the " . . . plume. . . has migrated beneath the adjacent townhomes and likely impacted the downgradient creek." Other than initial over-excavation associated with the removal of the USTs in 1990, no remediation has been initiated since approximately 1987.

Accordingly, this is a situation for which River Watch must rely upon federal statutory provisions which authorize citizen suits when regulatory agency processes have not resulted in viable and timely solutions to the petroleum contaminant problems in our Northern California communities.

### 2.     Former Chevron Station #9-3203
### 2026 North Texas Street, Fairfield, California

This site is located on North Texas Street, south of Pacific Avenue, in a mixed area of residential and commercial properties. The site operated as a Chevron service station between 1971 and 1995 at which time Chevron's lease expired. In August of 1995 the product storage and dispensing facilities were removed from the site. At the present time the site continues as a gasoline station occupied by an active American Energy service station. The real property on which the service station is situated is owned by Andree A. Benson.

A Shell service station currently exists at 1990 North Texas Street, some 300 feet to the south of the site. The two sites have combined plumes which are monitored jointly by Gettler-Ryan and Blaine Tech Services. Separate phase hydrocarbons (LNAPL) have been recorded at MW-3 from 1993 to 2005, but apparently none since that time.

The first reported release occurred in approximately 1983 followed by the installation of monitoring wells during that year. However, subsurface soil investigation was not conducted until 1993. Other than initial over-excavation work, very little remediation has occurred over the past 24 years. Consultant's reports indicate the site is defined laterally, and that vertical delineation has been completed below 15 ft. bgs; however, there is no indication that an aquifer impact assessment has been accomplished.

In 1999 Chevron's engineering consultant Cambria completed a sensitive receptor survey, relying upon Department of Water Resources records to determine whether there were any threatened receptors within 2,000 feet of the site. The survey found no surface waters, domestic wells, hospitals, or schools. In March of 2001 a conduit study revealed that the North Aquaduct which runs down North Texas Street adjacent to sewer and water lines could act as a migratory pathway for hydrocarbons. The potential for plume migration along this Aquaduct was not deemed particularly great, and field testing was apparently not done.

Cambria has admitted in its RAP that monitored natural attenuation cannot remediate this site within a reasonable period of time. Relying upon a cost analysis, Cambria has determined that over-excavation would be too disruptive of ongoing business activity at and adjacent to the site. Thus, even though over-excavation would probably be the most effective means to eliminate the source of soil and groundwater pollution and the threat to the surrounding environment, Cambria recommends two-phase extraction as the most cost effective strategy for site cleanup. .

At the present time (based upon October 2007 monitoring), the site has extremely high levels of petroleum hydrocarbons – as high as 120,000 ug/l at one of the wells, and 63,000 ug/l at another. Benzene has recently been found to be as high as 15,000 ug/l, and toluene as high as 10,000 ug/l. River Watch therefore remains concerned that the high levels of contaminants demand much more proactive remediation work than Cambria has recommended, and believes it is essential to actually test any likely preferential pathways (such as the Aquaduct) for the presence of contamination. In addition, River Watch would prefer that excavation of affected soil at the site be accomplished in order to eliminate the ongoing threat to groundwater. River watch also recommends that data be developed which attempts to determine the residual mass of contaminant within the plume so that some ongoing objective measure of remediation progress might be provided along with estimates of an eventual closure date.

River Watch believes Chevron must work much more proactively to neutralize the soil and groundwater beneath and around the site by employing best available technology as required by the Basin Plan adopted by the Regional Water Quality Control Board. Given the relatively shallow depth of the plume, the best available technology seems to be further excavation.

### 3. Former Chevron Service Station #9-2759
###    801 El Camino Real, San Bruno, California

This site is 1 of 3 former service stations located at the intersection of El Camino Real and San Bruno Avenue which have been the location of gasoline sales for over 50 years. A Shell branded station was situated at 798 El Camino Real; an ExxonMobil (now Valero) station existed at 800 El Camino Real; and, Chevron had operated at 801 El Camino Real. The real property on which the Chevron station is situated is currently owned by Peter Chang and the G.W. Williams Company.

The first reported release was in 1987. In the following year the USTs were removed along with an undisclosed amount of impacted soil. Groundwater extraction and treatment commenced between 1991 and 1996, but the process removed only approximately 340 pounds of petroleum

hydrocarbons with the filtering of over 2,000,000 gallons of groundwater. Quarterly groundwater monitoring occurred between 1989 and 2001 followed by semiannual monitoring from 2002 to the present. Finally in 2007, pilot testing occurred to determine the feasibility of specific remediation processes.

Currently, the work at the Chevron site is combined with petroleum contaminant monitoring at the adjacent Valero and Shell sites. As the plumes are commingled, one engineering consulting firm (Resource Environmental, LLC) is supervising the monitoring work at all 3 sites.

The commingled plume lies approximately 2,000 feet west of the San Francisco Bay. Groundwater flows east-southeast towards the Bay in an area of high hydraulic conductivity, where groundwater velocity can range as much as 300 feet per year. Four private irrigation wells have been located within 2,500 feet of the site, one as close as 720 feet to the east. Low levels of hydrocarbon impact have been detected in 3 of these 4 wells. In addition to groundwater contamination from the Chevron site, potential vapor impacts to the nearby residential units have been identified at the adjacent sites.

At the present time, 20 years after the first reported release, the lateral and vertical characterization of the commingled plume is still being assessed. The MTBE plume extends at least 400 feet downgradient from the Chevron site. Remediation of the Chevron site awaits a decision as to the most cost-effective cleanup method given the conditions. Meanwhile, groundwater concentrations of TPHg are as high as 43,000 ug/l as of the last available monitoring records of July of 2007. Benzene is as high as 7,300 ug/l, and toluene as high as 7,600 ug/l.

River Watch remains concerned that this is another site for which remediation efforts have long been deferred while regular contaminant monitoring has taken over as the principal activity. This site continues to represent an immediate threat to domestic water supplies and environmental degradation by infiltration into San Francisco Bay.

River Watch seeks Chevron's use of the best available technology to insure that no surface water, aquifer or groundwater is further contaminated by this plume. River Watch would like to insure that the full delineation of the plume is accomplished without further delay; and would like to review current sensitive receptor and preferential pathway survey results.

4.       **Current Chevron Service Station #9-3476**
         **12 Weed Boulevard South, Weed, California**

This site is located at the intersection of Weed Boulevard South (Highway 97) and Main Street in an area of mixed residential and commercial properties. The site is a currently active Chevron-branded service station adjacent to several other service station facilities including an active Shell branded service station, and former ARCO and Union 76 stations. The real property on which the service station is situated is currently owned by the Mountain Supply Company of Redding, CA.

The first unauthorized release of petroleum hydrocarbons was detected in 1985 when the USTs were upgraded.  In the following year monitoring wells were installed.  In 1987 groundwater extraction was commenced in an attempt to remediate the soil and impacted groundwater.  By August of 1996, with the extraction of over 3,200,000 gallons of groundwater, approximately 350 pounds of dissolved-phase hydrocarbons were removed along with 140 gallons of separate phase hydrocarbons (SPH or NAPL).  A soil vapor extraction system was initiated in 1991 and ran intermittently until 2000 when it was deactivated due to poor hydrocarbon removal rates.  The reports indicate the soil vapor extraction system removed only approximately 110 pounds of hydrocarbons as gasoline.

Engineering consultant Cambria initiated a two-phase extraction pilot test in 2004 to determine if such extraction processes would be feasible.  The test established that two-phase extraction would be ineffective for the soil conditions.

Groundwater lies at between 6 and 20 feet bgs.  It flows generally northward towards Boles Creek which is considered an 'at risk' sensitive receptor at approximately 300 to 400 feet downgradient to the north.  NAPL has been detected in 2 of the monitoring wells since 2000.  During the current quarter, approximately 0.50 gallons of LNAPL and water were removed from these wells by hand bailing.

At the present time very high levels of contamination are present in the wells. TPHd concentration levels are as high as 37,000 ug/l.  TPHg levels were  recorded at 38,000 ug/l in May of 2007.  Toluene is currently as high as 760 ug/l, while benzene is virtually non-detect.  There is no active remediation taking place to deal with the high levels of subsurface contamination.  Engineering reports indicate that contaminant concentrations tend to diminish rapidly below 15 ft bgs, but there has been no recommendation to employ over-excavation to remove the contamination despite the infeasibility and ineffectiveness of the other remediation systems which been tried.  It appears Chevron would prefer to continue its economic operations at this location while only monitoring and analysis occurs, regardless of the eventual environmental impact of plume migration.

The reports on file do not provide sensitive receptor survey information, nor do they recount whether conduit studies or preferential pathway studies have been conducted.  In addition, there seems to be no information as to whether any aquifer impact assessment has been done.  No data has been provided to assess the residual contaminant mass in the plume in order to have a benchmark against which the progress of further remediation might be gauged.

This, then, is another site for which River Watch believes that Chevron has failed to employ the best available technology towards the goals of full remediation.

5. **Chevron Service Station #9-3751**
   **5502 Thornton Avenue, Newark, California**

This is an active service station site located on the southwest corner of Thornton Avenue and Cedar Boulevard.  It is in a commercial area, adjacent to a shopping center with small businesses nearby

and residential properties south of the shopping center. The real property on which the service station is situated is currently owned by Jose and Marlu Vasquez.

A Chevron station was erected at the site in 1964. The original USTs were removed in 1978 during upgrading operations. Chevron sold the station in 1997 and it has been subsequently redeveloped as an independent service station.

The Alameda County Water District operates 2 municipal supply wells in the Newark Aquifer. The Darvon 1 well lies approximately 1,600 feet to the northeast of the site. The Cedar 2 well is located approximately 2,200 feet to the southeast. Groundwater is extracted from both municipal wells at rates of 3,300 gpm and 2,500 gpm respectively. The Aquifer has a relatively high hydraulic conductivity of 920 ft/day under pumping conditions due to the high permeability of the local soils. As a result, groundwater flow directions are influenced by the County's pumps. This influence affects the groundwater in and around the site. The Cedar 2 pump for example, will exert a draw-down of 3.2 feet in the groundwater of the site after being in operation for 8 days following a shut down period. The radius of influence of both of the municipal pumps is almost 6,000 linear feet.

The first leak at this site was reported in 1993. A site assessment was commenced in December of 1997. TPHg, BTEX, MTBE, TAME and TBA have been detected in groundwater. TPHg levels as recently as January of 2008 have been as high as 40,000 ug/l. Toluene is as high as 1,500 ug/l. MTBE is as high as 930 ug/l. Benzene is at 300 ug/l.

While Alameda County is rightfully concerned about the impact of the site plume upon the municipal water which is delivered to its residents by its water supply system; and, while there must be adequate oversight concerning the progress of remediation, River Watch remains concerned that some of the more obvious remedies to the situation have yet to be recommended.

Perhaps because the site no longer belongs to Chevron, there is an interest in allowing the current owners to continue the business of gasoline sales. This seems to be another example, however, of deference to business interests as opposed to environmental concerns. Chevron's consultant takes the position that "(q)uarterly groundwater monitoring is proposed as an interim corrective action for the Newark Aquifer."

The reports provided by the consultant do not recommend any remediation process which would eliminate the threat to the Alameda County water supply. Such reports do not seem to investigate likely conduits or preferential pathways beneath the site, nor do they advance the recommendation that further excavation work to remove affected soils would likely remove threats to the environment. If current sensitive receptor surveys exist and conduit studies are available, River Watch would like to be provided with copies as part of its involvement in this matter. Beyond the delineation of this site, it seems pertinent to determine the mass of residual contamination so that some remediation timeline might be provided as a means of assessing the progress of clean up.

6.    **Former Unocal Bulk Plant**
       **359 Main Street, Fortuna, California**

This former Unocal bulk plant is located on a one-acre vacant lot in an industrial section of Fortuna. The site is bordered on the north by Main Street, to the south by railroad tracks, to the east by vacant land, and to the west by a former Chevron bulk plant. This site was utilized as a bulk storage facility from approximately 1924 to 1964. The first petroleum impact was detected in approximately 1974. The real property on which the plant is situated is currently owned by Larry and Frances Montgomery.

Gasoline and diesel constituents have impacted soil and groundwater at the site as a result of releases in 1974 and 1978, the latter of which apparently led to several explosions in February of 1978 – one in a bowling alley related to gasoline vapors emanating from the Unocal site along sewer lines beneath Main Street. Various other releases are presumed to have occurred over the years due to bulk fuel operations. Regulatory agencies first received reports of soil and groundwater impacts in approximately 1988. Following contact by the North Coast Regional Water Quality Control Board in 1990, over-excavation to the extent of 2,700 tons of impacted soil was finally accomplished between 1997 and 2000.

Monitoring wells were installed beginning in 1991. Concentrations of contaminants have been measured since that time. NAPL was found at one of the wells (MW-4) as recently as 2002. In 1993 soil vapor extraction pilot testing determined that due to soil composition, vapor extraction might not be feasible. Further excavation work was done in 1997 after visual and olfactory indications of petroleum prompted specific areas of soil removal. Over the course of the next several years, 1,600 tons of impacted soil was placed on plastic. Finally in 2002 the soil was removed after the engineering consultant was advised by the Regional Water Quality Control Board that this soil could not be used as backfill, but had to be shipped to a landfill facility, and that clean backfill had to be imported to the site.

The site lies in the Eel River Valley. The Eel River is approximately 600 feet to the southwest, while Rohner Creek lies approximately 500 feet to the northeast. The shallow aquifer zone flows generally towards the south/southwest (towards the Eel River), while the deep aquifer zone at the site flows towards the east (towards Rohner Creek).

Fortuna is supplied by municipal water from 3 wells located on Eel River Drive, several miles from the site. The shallow groundwater at the site has a designated beneficial use as a drinking water supply in the North Coast Water Quality Control Board's Basin Plan. No sensitive receptor survey has apparently been conducted to determine whether there are private domestic wells at risk from the site's plume. A multi-phase extraction pilot test was initiated in 2005. The soil composition does not, however, seem conducive for the removal of residual contaminants.

This site remains problematic due to the recalcitrance of the soils to contemporary methods of subsurface remediation processes. The contaminated areas of this former plant are laterally extensive, but seem to be limited to vertical depths above 20 feet bgs. In view of the persistently

high concentrations of petroleum constituents (based on August, 2007 monitoring – 72,000 ug/l for TPHg; 7,300 ug/l for TPHd; 11,000 ug/l for toluene, and 6,800 for benzene) it would seem that further excavation work is essential to remove the environmental risks this site represents. Chevron's consultant seems content to do little more than investigate and monitor while this plume continues to migrate downgradient towards surface waters.

As with the other sites listed above, River Watch believes Chevron must take its remediation work much more seriously at this site and conduct preferential pathway studies and conduit studies to determine whether the Main Street sewer continues to provide offsite access for contaminants including harmful vapors, and an aquifer impact assessment. While records may no longer exist to determine the residual contamination based upon lost inventories, certainly with existing soil density data, an integration calculation can be done to compute the mass of the plume. This would provide a basis for determining removal progress – if active remediation ever takes place.

## III.    Regulatory Standards

Water Quality Objectives exist to ensure protection of the beneficial uses of water. Several beneficial uses of water exist. The most stringent water quality objectives for protection of all beneficial uses are selected as the protective water quality criteria. Alternative cleanup and abatement actions need to be considered that evaluate the feasibility of, at a minimum: (1) cleanup to background levels, (2) cleanup to levels attainable through application of best practicable technology, and (3) cleanup to protective water quality criteria levels. Existing and potential beneficial uses of area groundwater include domestic, agricultural, industrial and municipal water supply.

The Regional Water Quality Control Board has adopted a Water Quality Control Plan or Basin Plan, which designates all surface and groundwater within the North Coast and San Francisco Bay regions as capable of supporting domestic water supply. The Board has adopted Maximum Contaminant Levels ("MCLs") and/or Water Quality Objectives ("WQOs") for petroleum constituents in surface and groundwater within the region of 50 ppb for TPHg, 1 ppb for benzene, 150 ppb for toluene and 13 ppb for MTBE.

## IV.    Violations

### A. Violations of Permits, Standards and Regulations - [42 U.S.C. § 6972(a)(1)(A)]

Between approximately 2003 and the date of this Notice, Chevron has caused or permitted, causes or permits, or threatens to cause or permit petroleum contaminants, petroleum constituents and other hazardous waste to be discharged or deposited where it is, or probably will be, discharged into waters of the State and now creates, or threatens to create, a condition of pollution or nuisance. This Notice covers the statutory period of limitations to date running from July 18, 2003 through July 18, 2008. The discharge and threatened discharge of such petroleum waste is deleterious to the beneficial uses of water, and is creating and threatens to create a condition of pollution and nuisance which will continue unless the discharge and threatened discharge is permanently abated.

Provisions of the RCRA govern the use and operation of USTs used for storage of petroleum products (subchapter IX, 42 U.S.C. § 6991 et seq.). The RCRA UST regulatory program is adopted and implemented in California under the State Underground Storage of Hazardous Substance Account Act (California Health & Safety Code § 25280 et seq.).

Chevron's use and storage of petroleum at the 6 sites identified above has allowed significant quantities of hazardous petroleum constituents to be released or discharged into soil and groundwater in violation of provisions of the RCRA and California's UST regulatory programs including, but not limited to, provisions governing general operating requirements for USTs, release detection and prevention requirements, release reporting and investigation requirements, and release response and corrective action requirements.

Specifically, Chevron is responsible for the following statutory violations:

1. Failure to prevent a release, in violation of 40 CFR §§ 280.30, 280.31 and California Health & Safety Code §§ 25292.1(a) - (c), 25292.3(a) and (b).

2. Failure to properly detect and monitor releases, in violation of 40 CFR §§ 280.40 - 280.44 and California Health & Safety Code  § 25292.

3. Failure to properly report and keep records of the release, in violation of 40 CFR §§ 280.34, 280.50, 280.52, 280.53, 280.63(b) and California Health & Safety Code §§ 25289, 25293 and 25295(a)(1).

4. Failure to take proper corrective action, in violation of 40 CFR §§280.53, 280.60 - 280.66 and California Health & Safety Code § 25295(a)(1).

## B. Imminent and Substantial Endangerment - [42 U.S.C. § 6972(a)(1)(B)]

This Notice covers the statutory period of limitations to date running from July 18, 2003 through July 18, 2008. During that time, and well before, Chevron has used and stored, and continues to use and store, petroleum products at the 6 sites identified herein, in a manner which has allowed significant quantities of hazardous petroleum constituents to be discharged to soil and groundwater beneath each of the sites and also beneath adjacent properties. The contaminant levels of TPHg, benzene, toluene, and MTBE in groundwater at the sites are significantly greater than the allowable MCL and/or WQO for said constituents. Benzene, MTBE, TAME, and TBA are known or suspected carcinogens. Toluene is a reproductive toxin. Ethylbenzene, methanol and xylene are live toxins. All are known to harm both plants and animals. In their concentrations at these sites, these pollutants are creating an imminent and substantial endangerment to public health and the environment.

The violations alleged in this Notice are knowing and intentional in that Chevron has used, stored and sold petroleum products at the 6 sites identified herein which are known to contain hazardous substances, and has intended that such products will be sold to and used by the public. Chevron has known of the contamination since at least 2003, and has also known that failing to promptly

remediate the pollution allows the contamination to migrate through soil and groundwater at and adjacent to the sites, and to continually contaminate and re-contaminate actual and potential sources of drinking water

Violations of the RCRA of the type alleged herein are a major cause of the continuing decline in water quality and pose a continuing threat to existing and future drinking water supplies of Northern California. With every discharge groundwater supplies are contaminated. These discharges can and must be controlled in order for the groundwater supply to be returned to a safe source of drinking water.

In addition to the violations set forth above, this Notice is intended to cover all violations of the RCRA evidenced by information which becomes available to River Watch after the date of this Notice.

## V.      Identification of Northern California River Watch

The entity bringing this Notice is Northern California River Watch, a non-profit corporation dedicated to the protection and enhancement of the waters of the State of California including all rivers, creeks, streams and groundwater in Northern California. River Watch is organized under the laws of the State of California. Its address is 6741 Sebastopol Avenue, Suite 140, Sebastopol, CA, 95472 - telephone (707) 824-4372.

The violations of Chevron as set forth in this Notice affect the health and enjoyment of members of River Watch who reside and recreate in the affected watershed areas. Those members use the watershed for domestic water supply, agricultural water supply, recreation, sports, fishing, swimming, shellfish harvesting, hiking, photography, nature walks and the like. Their health, use and enjoyment of this natural resource are conditions specifically impaired by Chevron's violations of the RCRA as set forth in this Notice.

## VI.     Contact Information

River Watch has retained legal counsel with regard to the issues raised in this Notice. All communications should be addressed as follows:

> Jack Silver, Esquire
> Law Office of Jack Silver
> P.O. Box 5469
> Santa Rosa, CA 95402-5469
> Tel. (707) 527-8175 / Fax (707) 527-8675

## VII.    Conclusion

River Watch believes this Notice sufficiently states grounds for filing suit under the statutory and regulatory provisions of the RCRA as to the 6 sites referenced above. At the close of the notice

periods or shortly thereafter, River Watch intends to file a suit against Chevron and the individual real property owners and/or site operators under the provisions of the RCRA for each of the violations as alleged herein.  River Watch is willing to discuss effective remedies for the violations referenced in this Notice, and encourages Chevron, if it so wishes, to initiate those discussions immediately so that we might be on track to resolving the issues before the end of the notice period. River Watch will not delay the filing of a lawsuit if discussions have not commenced by the time the notice period ends.

Very truly yours,

Jack Silver

JS:lha
cc:

Stephen L. Johnson, Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Wayne Nastri, Regional Administrator
U.S. Environmental  Protection Agency, Region 9
75 Hawthorne St.
San Francisco, CA 94105

Dorothy R. Rice, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California  95812-0100

Mark Leary, Executive Director
California  Integrated Waste Management Board
1001 "I" Street
Sacramento, CA 95814

The Prentice-Hall Corporation System, Inc.
Registered Agent for
Chevron Corporation
Chevron U.S.A, Inc.
P.O. Box 526036
Sacramento, CA 95852

Kevin and Julie Hinkley  [Site #1]
5269 Crow Canyon Road
Castro Valley, CA 94552

Andree A. Benson [Site #2]
34 Creekridge Court
San Mateo, CA 94402

Peter Chang [Site #3]
G.W. Williams Company
3190 Clearview Way
San Mateo, CA 94402-3752

Mountain County Supply Co.  [Site #4]
P.O. Box 491687
Redding, CA  96049

Jose and Marlu Vasquez  [Site #5]
37201 Aleppo Drive
Newark, CA 94560

Larry and Frances Montgomery  [Site #6]
P.O. Box 285
Houston, TX  77007-0285

Station operator
5502 Thornton Avenue
Newark, CA  94560

Station operator
12 Weed Boulevard South
Weed, CA 96094

Robert C. Goodman, Esquire
Rogers Joseph O'Donnell
311 California Street
San Francisco, CA 94104-2695

# Law Office of Jack Silver



P.O. Box 5469          Santa Rosa, California 95402
Phone  707-528-8175    Fax  707-528-8675
lhm28843@sbcglobal.net


*Via Registered Mail - Return Receipt Requested*


April 5, 2010


David J. O'Reilly, CEO and President
Chevron Corporation
6001 Bollinger Canyon Road
San Ramon, CA 94583

Gary P. Luquette, President
Chevron U.S.A., Inc.
6001 Bollinger Canyon Road
San Ramon, CA 94583

Mr. Mark Hom
Ms. Anna Cheng
3135 Gibbons Drive
Alameda, CA  94501

Angelo Orciuoli, (Registered Agent)
AOK, LLC
2 Brady Place
Menlo Park, CA 94025

**Re:    Notice of Violations and Intent to File Suit or Amend Suit under the Resource
          Conservation and Recovery Act**

Dear Owners, Site Managers and Responsible Parties:

        The Federal Resource Conservation and Recovery Act ("RCRA") 42 U.S.C. § 6901 et
seq.,  requires that sixty (60) days prior to the initiation of an action for violation of permit,

standard, regulation, condition, requirement, prohibition or order effective under RCRA, a private party must give notice of the violation to the alleged violator, the Administrator of the U.S. Environmental Protection Agency and the State in which the violation is alleged to have occurred (42 U.S.C. § 6972(b)(1)(A)). The RCRA also requires that a private party must provide ninety (90) days prior notice to the alleged violator, the Administrator of the Environmental Protection Agency and the State in which the violation is alleged to have occurred before initiating an action for an imminent and substantial endangerment to human health or the environment. (42 U.S.C. § 6972(b)(2)(A)).

However, if Subtitle C, Subchapter III, violations are alleged such as in this Notice, actions can be brought without observing the 60/90 day notice waiting periods that are applicable to 42 U.S.C. §§ 6972(a)(1)(A) and § 6972(a)(1)(B) claims; also, when Subtitle C, Subchapter III claims are brought in conjunction with §§ 6972(a)(1)(A) and 6972(a)(1)(B) claims, none of the claims require a waiting period before a complaint under RCRA provisions may be filed.

On behalf of Northern California River Watch ("River Watch"), I am providing statutory notification to Chevron Corporation and Chevron U.S.A., Inc. of continuing and ongoing violations of the RCRA, in conjunction with their continuing operations at three former Northern California underground storage tank ("UST") sites as identified in this Notice.

River Watch is also providing notice of these same violations to the owners of the real property on which these sites are situated, known to River Watch at this time to be Mark Hom, Anna Cheng and AOK, LLC. Pursuant to the RCRA, the current owners of these sites may be in part legally responsible for ongoing contamination due to mere ownership of the real property on which and under which the hazardous contamination has been found.

River Watch hereby notifies Chevron Corporation, Chevron U.S.A. Inc., Mark Hom Anna Cheng and AOK, LLC (collectively hereafter, "Polluters"), that at the expiration of the appropriate notice periods under the RCRA, River Watch intends to commence a civil action against Polluters, or amend any pending actions against Chevron Corporation and Chevron U.S.A., Inc. on the following grounds:

1.  Polluters' use and storage of petroleum products at the sites identified in this Notice has violated and continues to violate permits, standards, regulations, conditions, requirements and/or prohibitions effective pursuant to the RCRA regarding storage of petroleum in USTs. [42 U.S.C. § 6972(a)(1)(A)];

2.  Polluters' operations at the sites identified in this Notice have caused petroleum contamination of soil and groundwater which presents an imminent and substantial endangerment to human health and the environment [42 U.S.C. § 6972(a)(1)(B)].

3.  Polluters' past and current operations at the sites identified in this Notice violate the provisions of RCRA subchapter III (Subtitle C) which governs the handling of hazardous wastes. River Watch contends that Polluters have inadequately maintained records of the manner in which their hazardous wastes have been

treated, stored and/or disposed of; that they have inadequately monitored, reported and/or complied with existing regulations concerning their hazardous wastes; that they have inadequately provided storage facilities for their hazardous wastes; and, in the past that they have not developed adequate contingency plans for effective action to minimize damage from the unauthorized releases of hazardous contaminants – all of which have presented a substantial endangerment to human health and to the environment.

**SITES**

**1.      3135 Gibbons Drive, Alameda, California**

This former UST site is located at the corner of Gibbons Drive and Fernside Boulevard in a residential section of Alameda. The initial unauthorized release was discovered in approximately July of 1986 when the dispenser islands and associated piping were removed, along with the USTs.  Groundwater at the site is shallow, less than five feet bgs.

Following the removal of the station building and related equipment, a single family home was constructed on the site by June of 1989,  currently owned by Mark Hom and Anna Cheng. By October of 1995, 10 monitoring wells had been installed.   Several soil gas vapor surveys were conducted between July of 1987 and October of 2002.   It is unclear whether the previous surveys have documented any risks to human health due to soil vapor gas.

Between 2001 and early 2002, there were 5 mobile extraction efforts which intended to reduce the free-phase hydrocarbons found in at least one location on site.  The extraction efforts have not succeeded in eliminating the separate phase hydrocarbons ("SPH"), or in remediating this property.   Monitoring in late 2008 found SPH of 0.4 feet at well C-1.  Monitoring in December of 2008 continued to document SPH in well C-1, adjacent to the residential dwelling. On the basis of reports available at this time, it appears very little remediation work has been conducted in addition to the 5 extraction events and soil gas vapor surveys.  According to the Alameda County Health Care Services Agency, there has been no on-going remediation work since the extraction trench at the site was shut down.

The most recent available monitoring appears to be that of February of 2009, with  data noting TPHg levels as high as 59,000 ug/l, and benzene levels as high as 3,100 ug/l (both at C-1).

At the present time, the Alameda County Health Care Services Agency has called for renewed soil vapor gas evaluation to insure that the residents of the single family home are not exposed to hazardous fumes, and for remediation work to deal with the SPH, beyond the monthly visits to bail out the free-phase product from C-1.

On the basis of the current condition of this site, River Watch believes that RCRA and State of California remediation provisions require, at a minimum, the following evaluative and remediation work:

- Elimination of free product so that effective site remediation can begin;

- A current vapor entrapment survey which satisfies current standards as set by the Alameda County Health Care Services Agency for determination of threat to human health;

- A current sensitive receptor survey which determines the threat to hydrocarbon migration from the site into the Airport Channel, a tidal canal that lies approximately 650 feet downgradient of the site;

- A current preferential pathway study which determines whether any adjacent sewer lines or storm drains may provide access to sensitive receptors around the site;

- Complete site characterization to include the installation of additional monitoring wells to eliminate what the Alameda County Health Care Services Agency has identified as data gaps in the current monitoring reports;

- Performance of the necessary analyses to determine the residual hydrocarbon mass as a means of gauging progress of contamination removal.

## 2.    5810 Nave Drive, Novato, California

This former service station site is located on the northwest corner of Nave Drive (formerly Redwood Boulevard) at the intersection of Roblar Drive and close to a Highway 101 off ramp.  The property underlying this site is technically still owned by the California Dept. of Transportation (CalTrans), but has been deeded to the City of Novato, although the City appears to have not formally accepted the deeded land as yet.  There is currently a bus shelter located on this property.

An unauthorized petroleum hydrocarbon leak was first detected  in approximately June of 1983 – nearly 27 years ago.  All of the facilities, USTs, dispenser islands and associated piping were removed by the following year.

No remediation has been conducted since the UST was removed in 1984.   In 2006 the consultant at that time proposed to inject oxygen to assist the bioremediation of the hydrocarbons, but the Regional Water Quality Control Board required a Feasibility Study and Corrective Action Plan prior to that work. It is apparent from the records on file that no Feasibility Study and Corrective Action Plan has ever been submitted.

Groundwater at the site remains significantly contaminated.  Monitoring reports indicate the levels of contaminants under the property have remained stable, fluctuating only due to seasonal increases in groundwater flow.  As of the last reported monitoring done in April of 2009, TPHg levels were as high as 29,000 ug/l, and benzene levels were as high as 14,000 ug/l. Inasmuch as these levels have been shown to fluctuate, it may be reasonable to anticipate that the levels may revert to the 47,000 ug/l for TPHg and 17,000 ug/l for benzene as was found in

July of 2008. The site consultant indicated that there has been no natural attenuation at anywhere near a suitable rate.

Neither a Conceptual Site Model, nor a Feasible Source Control, as recommended by Regional Water Quality Control Board has ever been submitted or performed. The Board believes proactive work to eliminate or reduce the source mass must be initiated, because groundwater concentrations are significant. River Watch agrees.

On the basis of the current condition of this site, River Watch believes that RCRA and State of California remediation provisions require, at a minimum, the following evaluative and remediation work:

• Elimination or reduction of the high levels of hydrocarbons by means of some effective remediation strategy;

• A current sensitive receptor survey which determines the threat to hydrocarbon migration site northward into a surface water, the Arroyo San Jose, which is 600 feet downgradient of the site;

• A current preferential pathway study which determines whether any adjacent sewer lines or storm drains may provide access to sensitive receptors around this site. There are currently only 6 monitoring wells; 2 in a downgradient direction. This leaves broad data gaps in the monitoring which need to be supplemented with the installation of additional wells;

• Complete site characterization to include the installation of additional monitoring wells as noted above;

• An aquifer profile to analyze the extent to which the TPHg and benzene may be migrating into any underlying aquifer and affecting potential sources of drinking waters;

• Performance of the necessary analyses to determine the residual hydrocarbon mass as a means of gauging progress of contamination removal.

**3.     713 Silverado Trail, Napa, California**

The real property underlying this former Chevron/Texaco service station site is currently owned by AOK, LLC. Four USTs were originally removed and replaced in the early 1960s. In December of 1990, 4 replacement tanks were removed and approximately 340 cubic yards of hydrocarbon impacted soil were excavated. After service station operations at Bartley's Texaco ceased in 1990, the site became a truck rental yard. It is currently used as a automotive repair shop utilizing the original station building.

Since 1990, there have been regular subsurface investigations, but very little in the way of proactive remediation. Sensitive receptor surveys have resulted in findings of private water supply wells within 500 feet of the site, but these have been deemed to be upgradient or cross-

gradient, and not threatened by the on-going groundwater contamination. The site consultant has concluded that the site is generally defined, although this reliance seems to be based upon a very limited number of monitoring wells.

Remediation work began only in 2006 with the application of a surfactant solution intending it might mitigate the residual, non-aqueous-phase liquid hydrocarbons. Given the remaining high levels of TPHd, is seems this strategy has not proven effective. Extraction events did take place, removing approximately 22,500 gallons of hydrocarbon-impacted groundwater, but there is no data [i.e. no residual mass calculations] to allow the regulators to determine how much contaminated groundwater remains under and around the site.

At the present time, TPHd levels are as high as 76,000 ug/l, and TPHg levels as high as 13,000 ug/l.   Sulfate (the surfactant used) is as high as 100,000 ug/l, on the basis of the last recorded monitoring event of September 1, 2009.   The site consultant has indicated that levels of contamination continue to remain within historical ranges.  This seems to imply that continued remediation efforts are required before the site can be returned to State-mandated Maximum Contaminant Levels.

On the basis of these findings, River Watch believes that RCRA and State of California remediation provisions require, at a minimum, the following evaluative and remediation work:

•      Elimination or reduction of the high levels of TPHd and TPHg hydrocarbons by means of some effective remediation strategy;

•      A current sensitive receptor survey which determines the threat to hydrocarbon migration westward into a surface water, the Napa River, approximately 700 feet downgradient of the site;

•      A current preferential pathway study which determines whether any adjacent sewer lines or storm drains and other conduits may provide access to sensitive receptors around the site. There are broad data gaps in the monitoring that should be supplemented with the installation of additional downgradient wells;

•      Complete site characterization to include the installation of additional monitoring wells as noted above;

•      An aquifer profile to analyze the extent to which the TPHg and benzene may be migrating into any underlying aquifer and affecting potential sources of drinking water, as well as impacting the Napa River;

•      Performance of the necessary analyses to determine the residual hydrocarbon mass as a means of gauging progress of contamination removal.

## REGULATORY STANDARDS

The Resource Conservation and Recovery Act of 1976 is federal law of the United States, the goals of which include the protection of the public and the environment from harm caused by waste storage and disposal, and to mandate the proper remediation of soil and groundwater which has been contaminated by hazardous waste and hazardous products, including petroleum hydrocarbons and gasoline formula constituents. The RCRA is a strict liability statute with a statute of limitations of five years. Pursuant to the RCRA, California has enacted laws and regulations that must be observed in conjunction with its provisions.

California's "Water Quality Objectives" exist to ensure protection of the beneficial uses of water. Several beneficial uses of water exist, and the most stringent water quality objectives for protection of all beneficial uses are selected as the protective water quality criteria. Alternative cleanup and abatement actions need to be considered that evaluate the feasibility of, at a minimum: (1) cleanup to background levels, (2) cleanup to levels attainable through application of best practicable technology, and (3) cleanup to protective water quality criteria levels. Existing and potential beneficial uses of area groundwater include domestic, agricultural, industrial and municipal water supply.

The Regional Water Quality Control Board has adopted a Water Quality Control Plan or Basin Plan which designates all surface and groundwater within the North Coast and San Francisco Bay regions as capable of supporting domestic water supply. The Board has adopted Maximum Contaminant Levels ("MCLs") and/or Water Quality Objectives ("WQOs") for petroleum constituents in surface and groundwater within the region of 50 ppb for TPHg, 1 ppb for benzene, 150 ppb for toluene and 5 ppb for MTBE.

## VIOLATIONS

**1.    Permits, Standards and Regulations [42 U.S.C. § 6972(a)(1)(A)]**

Polluters' use and storage of petroleum products at the sites identified in this Notice has violated and continues to violate permits, standards, regulations, conditions, requirements and/or prohibitions effective pursuant to the RCRA regarding storage of petroleum in USTs. [42 U.S.C. § 6972(a)(1)(A)]

Disposition, discharge and release of pollutants at the Sites can be traced as far back as the 1980's. RCRA is a strict liability statute. The range of dates covered by this Notice Polluters have caused or permitted, cause or permit, or threaten to cause or permit, petroleum contaminants, petroleum constituents and other hazardous waste to be discharged or deposited where it is, or probably will be, discharged into waters of the State and now creates, or threatens to create, a condition of pollution or public nuisance. The discharge and threatened discharge of such petroleum waste is deleterious to the beneficial uses of water, and is creating and threatens to create a condition of pollution and nuisance which will continue unless the discharge and threatened discharge is permanently abated.

2.      **Mishandling of Hazardous Waste [42 U.S.C. § 6924 et seq.]**

From April 1, 2005 through April 1, 2010, Polluters used and stored petroleum products at the Sites in a manner which has allowed significant quantities of hazardous petroleum constituents to be discharged to soil and groundwater beneath the Sites and beneath adjacent properties.  Contaminant levels of TPHg, benzene, toluene, and MTBE in groundwater at the Sites are significantly greater than the allowable MCLs and/or WQOs for said constituents.

River Watch alleges that Polluters have, at all times material, engaged in the following activities in violation of the RCRA's waste handling provisions:

•      Failed to adequately maintain records of hazardous wastes as identified in this Notice which were treated, stored or otherwise disposed of on or offsite [42 U.S.C. §6924(a)(1)];

•      Failed to satisfactorily monitor, inspect, and report hazardous wastes in accordance with RCRA provisions [42 U.S.C. §6924(a)(2)];

•      Failed to adequately treat, store or properly dispose of hazardous waste found at the Sites[42 U.S.C. §6924(a)(3)];

•      Failed to adequately locate, design and construct hazardous waste treatment, storage or disposal facilities [42 U.S.C. §6924(a)(4)];

•      Failed to properly implement contingency plans for effective action to minimize unanticipated damage from the treatment, storage or disposal of hazardous waste found at the Sites [42 U.S.C. §6924(a)(5)].

Information currently available to River Watch indicates that the effects of Polluters' handling, treatment, storage, transportation, and/or disposal of hazardous waste in violation of RCRA § 3004 has occurred every day during the past five (5) years, or on numerous separate occasions, and, that these violations are continuing.

3.      **Unpermitted Handling, Treatment, Storage, Transportation and/or Disposal of Hazardous/Solid Waste [42 U.S.C. § 6925 et. seq.]**

River Watch alleges that from April 1, 2005 to April 1, 2010 Polluters have engaged in the following activities in violation of the RCRA's waste handling provisions:

•       Polluters' deposition and maintenance of hazardous and/or solid waste as described herein causes and has caused the generation and discharge to the environment of hazardous waste;

•      Polluters have installed and maintained a system of conveyances to dispose of  hazardous and/or solid waste generated and released from the Sites;

- Polluters do not possess permits for the handling, storage, treatment, transportation, and/or  disposal of hazardous or solid waste at the Sites;

- Polluters' unpermitted handling, storage, treatment, transportation and/or disposal of hazardous and/or solid waste is a violation of RCRA § 3005, 42 U.S.C. § 6925.

Information currently available to River Watch indicates that the effects of Polluters' handling, treatment, storage, transportation, and/or disposal of hazardous waste in violation of RCRA § 3005 has occurred every day during the past five (5) years, or on numerous separate occasions, and that these violations are continuing.

**4.    Prohibition Against Open Dumping [42 U.S.C. § 6945 et. seq.]**

River Watch alleges that from April 1, 2005 to April 1, 2010 Polluters have engaged in the following activities in violation of the RCRA's waste handling provisions:

- Polluters have engaged in open dumping by their discharge of hazardous waste to open ground where it will and has contaminated the soils, groundwater and surface waters as described herein;

- The Sites do not qualify as landfills under 42 U.S.C. § 6944, and do not qualify as facilities for the disposal of hazardous and/or solid waste.

- Polluters have no RCRA-authorized permit for the disposal, storage or treatment of solid or hazardous waste of the type currently and historically discharged at the Sites.

Information currently available to River Watch indicates that the effects of Polluters' open dumping in violation of RCRA § 4005 has occurred every day during the past five (5) years, or on numerous separate occasions, and that these violations are continuing.

**5.    UST Regulations [42 U.S.C. § 6991 et. seq.]**

Provisions of the RCRA govern the use and operation of USTs used for storage of petroleum products (subchapter IX, 42 U.S.C. § 6991 et seq.), and above-ground tanks used for the same purposes.  The RCRA UST regulatory program is adopted and implemented in California under the State Underground Storage of Hazardous Substance Account Act (California Health & Safety Code § 25280 et seq.).

From April 1, 2005 to April 1, 2010,  Polluters' use and storage of petroleum at the Sites has allowed significant quantities of hazardous petroleum constituents to be released or discharged into soil and groundwater in violation of provisions of the RCRA and California UST regulatory programs including, but not limited to, provisions governing general operating requirements for USTs, release detection and prevention requirements, release reporting and investigation requirements, and release response and corrective action requirements.

Specifically, with respect to each of the Sites, River Watch alleges Polluters are responsible for the following statutory violations:

•       Failure to prevent a release, in violation of 40 CFR §§ 280.30, 280.31 and California Health & Safety Code §§ 25292.1(a) - (c), 25292.3(a) and (b);

•       Failure to properly detect and monitor releases, in violation of 40 CFR §§ 280.40 - 280.44 and California Health & Safety Code § 25292;

•       Failure to properly report and keep records of the release, in violation of 40 CFR §§ 280.34, 280.50, 280.52, 280.53, 280.63(b) and California Health & Safety Code §§ 25289, 25293 and 25295(a)(1);

•       Failure to take proper corrective action, in violation of 40 CFR §§ 280.53, 280.60 - 280.66 and California Health & Safety Code § 25295(a)(1).

Information currently available to River Watch indicates that the effects of Polluters' violations of RCRA's UST regulations, RCRA § 9001, have occurred every day during the past five (5) years, or on numerous separate occasions, and that these violations are continuing.

## 6.    Imminent and Substantial Endangerment [42 U.S.C. § 6972(a)(1)(B)]

Between April 1, 2005 and April 1, 2010, Polluters' used and stored petroleum products at the Sites in a manner which has allowed significant quantities of hazardous petroleum constituents to be discharged to soil and groundwater beneath the Sites and beneath adjacent properties.  The contaminant levels of TPHg, benzene, toluene, and MTBE in groundwater at the Sites are significantly greater than the allowable MCL and/or WQO for said constituents. Benzene, MTBE, TAME, and TBA are known or suspected carcinogens.  Toluene is a reproductive toxin.  Ethylbenzene, methanol and xylene are live toxins.  All are known to harm both plants and animals.  In their concentration at the Sites, these pollutants are creating an imminent and substantial endangerment to public health and the environment.

Information currently available to River Watch indicates that the effects of Polluters' handling, treatment, storage, transportation, and/or disposal of its hazardous waste in violation of RCRA § 7002(a)(1)(B) have occurred every day during the past five (5) years, or on numerous separate occasions, and that these violations are continuing.

 The violations alleged in this Notice are knowing and intentional in that Polluters have used, stored and sold petroleum products which are known to contain hazardous substances; and, have intended that such products will be sold to and used by the public.  Polluters have known of the contamination at the Sites at least since the late 1980's, and have also known that failing to promptly remediate the pollution allows the contamination to migrate through soil and groundwater at and adjacent the Sites, and to continually contaminate and re-contaminate actual and potential sources of drinking water.

Violations of the RCRA of the type alleged herein are a major cause of the continuing decline in water quality and pose a continuing threat to existing and future drinking water supplies of Northern California. With every discharge groundwater supplies are contaminated. These discharges can and must be controlled in order for the groundwater supply to be returned to a safe source of drinking water.

In addition to the violations set forth above, this Notice is intended to cover all violations of the RCRA evidenced by information which becomes available to River Watch after the date of this Notice.

## ENTITY BRINGING NOTICE - NORTHERN CALIFORNIA RIVER WATCH

Northern California River Watch is a non-profit corporation dedicated to the protection and enhancement of the waters of the State of California including all rivers, creeks, streams and groundwater in Northern California.  It is organized under the laws of the State of California. Its address is 500 No. Main Street Suite 110, Sebastopol, CA, 95472; telephone number is (707) 824-4372.

The violations of Polluters as set forth in this Notice affect the economic stability, physical health and aesthetic enjoyment of members of River Watch who reside and recreate in the affected watershed areas.  The members of River Watch use the watershed for domestic water supply, agricultural water supply, recreation, sports, fishing, swimming, hiking, photography, nature walks and the like.  Their health, use and enjoyment of this natural resource are conditions specifically impaired by the violations of the RCRA as set forth in this Notice.

## CONTACT INFORMATION

River Watch has retained legal counsel to represent them in this matter. All communications should be addressed to:

Jack Silver, Esquire
Law Office of Jack Silver
P.O. Box 5469
Santa Rosa, CA 95402
Tel. (707) 528-8175
Fax (707) 528-8675

## CONCLUSION

River Watch believes that this Notice sufficiently states the grounds for filing suit under the statutory and regulatory provisions of the RCRA as to the Sites identified above.  At the close of the notice periods *or substantially earlier*, River Watch intends to file a suit against Polluters and/or amend any current suit against Chevron Corporation and Chevron U.S.A. Inc., for each of the violations of the RCRA alleged herein, and with respect to the existing conditions at the Sites.

However, River Watch is willing to discuss effective remedies for the violations referenced in this Notice.  If Polluters wish to pursue such discussions in the absence of litigation, they are encouraged to initiate such discussions immediately so that the parties might be on track to resolving the issues raised in this Notice.  River Watch will not delay the filing of a lawsuit if discussions have not commenced within a reasonable time following receipt of this Notice.

Very truly yours,


Jack Silver

JS:lhm

cc:   Lisa Jackson, Administrator
      U.S. Environmental Protection Agency
      401 M Street, N.W.
      Washington, D.C. 20460

      Wayne Nastri, Regional Administrator
      U.S. Environmental  Protection Agency, Region 9
      75 Hawthorne St.
      San Francisco, CA 94105

      Dorothy R. Rice, Executive Director
      State Water Resources Control Board
      P.O. Box 100
      Sacramento, California  95812-0100

      Mark Leary, Executive Director
      Calif. Integrated Waste Management Board
      1001 "I" Street
      Sacramento, CA 95814

      Executive Director
      Calif. Department of Toxic Substances Control
      P.O. Box 806
      Sacramento, CA 95812-0806

      California Attorney General's Office
      California Department of Justice
      P.O. Box 944255
      Sacramento, CA 94244-2550

California Environmental Protection Agency
P.O. Box 2815
Sacramento, CA 95812-2815

The Prentice-Hall Corporation System, Inc.
Registered Agent for Service
Chevron Corporation
Chevron U.S.A., Inc.
P.O. Box 526036
Sacramento, CA 95852